Filed 11/7/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MICHAEL Z. TUN, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> WELLS FARGO DEALER SERVICES, INC., <br><br> Defendant and Appellant; <br><br> PLUS WEST LA CORP. et al., <br><br> Defendants and Respondents. | D070447 <br><br> (Super. Ct. No. 30-2011-00510443) |


APPEAL from a judgment of the Superior Court of Orange County, Richard W. Luesebrink, Judge.  Affirmed in part and reversed in part.


Law Offices of Robert G. Padrick and Robert G. Padrick for Plaintiff and Appellant.

Severson & Werson, Jan T. Chilton and Mark D. Lonergan for Defendant and Appellant.

Beam, Brobeck, West, Borges & Rosa, Stephen A. Rosa and Susan D. Garbutt for Defendants and Respondents.

This case arises from the purchase by plaintiff and appellant Michael Z. Tun (Tun) of a used 2007 BMW automobile (vehicle) from defendant and respondent Plus West LA Corporation, dba CA Beemers (CA Beemers). Defendant and appellant Wells Fargo Dealer Services, Inc., an incorporated division of Wells Fargo Bank, N.A. (collectively Wells Fargo), subsequently accepted assignment of Tun's retail installment sales contract (RISC) under an agreement with CA Beemers and/or defendant and respondent West LA Corporation, dba California Beemers (California Beemers) (sometimes collectively dealer).

In his *84-page* third amended complaint (TAC), Tun asserted 11 causes of action based primarily on his contention that dealer knowingly and intentionally failed to disclose that the vehicle had suffered "frame/unibody damage" from a prior collision, which damage Tun further alleged "existed at the time it was sold" to him and which "substantially decreased the value of the vehicle." Tun alleged he first learned the vehicle had been in a prior collision when he took it to a mechanic near his home, after he experienced problems while driving the vehicle.

After a multi-day trial, the jury returned a verdict in favor of dealer, finding dealer had not committed fraud, breached its contract with Tun or otherwise engaged in conduct that violated the Consumers Legal Remedies Act (Civ. Code,[1] § 1750 et seq.; hereafter CLRA). The jury also found that Wells Fargo was not derivatively liable as holder of the RISC.

---

[1] Unless otherwise noted, all further statutory references are to the Civil Code.

Following the verdicts, the court granted Tun's new trial motion only as to Wells Fargo, despite the fact Wells Fargo was only liable to the extent, if at all, dealer was liable. In granting the motion, the court determined it had erred in ruling pretrial that Tun could not comment to the jury regarding Wells Fargo's tender under section 2983.4—a statute awarding a party prevailing under the Automobile Sales Financing Act (hereafter ASFA) reasonable attorney fees and costs—of the amount Tun had paid under the RISC ($15,700).

Wells Fargo appeals from the new trial order, arguing that the court had correctly ruled in limine that Tun could not comment on Wells Fargo's tender under section 2983.4 because that tender could not be treated as a judicial admission of liability; that the tender was irrelevant to the issues decided by the jury, which focused on the conduct of dealer in connection with the sale of the vehicle; that, even assuming error, Tun could not establish prejudice; and that the new trial order was improper because there were no issues left to try, inasmuch as Wells Fargo's liability, if any, was derivative of dealer's, and dealer was exonerated.

In his cross-appeal, Tun contends that the court erred in denying his new trial motion as to dealer but granting it as to Wells Fargo because such rulings have created "inconsistent verdicts"; that grounds other than the Wells Fargo tender supported the grant of the new trial motion; that he was entitled to judgment notwithstanding the verdict (JNOV) on various claims; and that because of the court's errors, dealer is not entitled to an award of attorney fees.

As we explain, we conclude the court erred in granting Tun a new trial against Wells Fargo because we conclude the court's pretrial ruling precluding comment on the

3

Wells Fargo tender was not legal error. As we further explain, we also reject Tun's cross-appeal.

## FACTUAL AND PROCEDURAL OVERVIEW

Witness Michael Assar testified that, for more than a decade, he was the sole shareholder of California Beemers, which operated a car dealership in West Los Angeles specializing in the sale of used BMW's. California Beemers held both a wholesale and a retail license until about March 2011, when California Beemers became a car wholesaler only. That same month, Assar opened CA Beemers in Costa Mesa, which held a retail license. Assar bought cars at auction through California Beemers that he then sometimes sold to CA Beemers to market and sell to the public.

With respect to the vehicle at issue in this case, Assar testified he bought it in late March 2011 at an auction in Riverside and then sent the vehicle to California Beemers, Inc. (CBI), which Assar also owned and which was the mechanic shop for California Beemers and CA Beemers. Assar testified that before purchasing the vehicle at auction, he was aware the vehicle had been designated as damaged because on the windshield written in a grease pen it stated, " 'Frame Damage Unibody' " and because the auctioneer made a similar announcement before the car went to auction. Assar further testified that the vehicle was not in fact frame-damaged and that the owner of the vehicle designated it as such to avoid any and all liability in connection with the sale of the vehicle. Despite multiple bids, Assar was the highest bidder and paid $27,500 for the vehicle, excluding the auction fee.

The vehicle invoice Assar received from the auction house also stated, " 'frame/unibody frame.' " After purchasing the vehicle, Assar paid $130 to have the

vehicle inspected by the auction house. The inspection report noted the frame damage, stating " 'floor pan damage,' " but also stated, " 'Frame check, okay.' " Assar testified that he ordered a "Carfax report" on the vehicle; that the Carfax report did not disclose any frame damage or damage due to accident or collision; and that once he obtained the inspection report from the auction house and compared it to the Carfax report, he realized the two reports were inconsistent. Assar decided not to return the car to the auction house, as, in his view, Carfax "doesn't know much." After the vehicle was subsequently inspected at CBI, Assar put it up for sale through retailer CA Beemers.

Assar testified that California Beemers, but not CA Beemers, advertised the vehicle on an internet website on a wholesale basis only; that, as a result, the price of the vehicle was slightly lower than the retail price because a wholesaler had to be able to sell the car at retail and make a profit; that if someone (i.e., Tun) saw the vehicle advertised on the internet, it would have been for wholesale purposes only; and that after CA Beemers opened for business on March 1, 2011, it did not advertise cars widely on the internet but instead only on its own website.

Tun, however, testified that he found the vehicle from an advertisement on the internet; that the sale price of the vehicle was about $34,900, or (slightly) lower than the price he ultimately paid for it; that he printed out the vehicle advertisement from the internet website; and that along with witness Glenda Villon, his then fiancé, he went to CA Beemers in Costa Mesa with the printout to look at the vehicle. When Tun showed the printout of the vehicle to Frank Safai, a CA Beemers salesperson, according to Tun Safai was unable to locate that particular vehicle on the lot. Tun nonetheless testified the

5

vehicle identification number from the vehicle in the advertisement matched the number of the vehicle he ultimately purchased from CA Beemers.

Tun testified he looked at one or two other BMW's on the CA Beemers lot; that he test drove the vehicle and ended up purchasing it; that during the course of test driving the vehicle, he specifically asked Safai if the vehicle had been in any accidents, to which Safai responded, " 'No' "; that there was nothing written on the car suggesting it had " 'frame damage,' "; that Safai presented him with the Carfax report, which showed the car was "clean" and had not been involved in any accidents; and that Safai specifically pointed to various provisions within that report, which also showed the vehicle had not been in any collisions or suffered frame/unibody damage.

Tun also testified that he wanted to trade in his truck towards the purchase of the vehicle; that he told Safai the truck had not been in an accident while he owned it; that before Tun signed any of the paperwork to purchase the vehicle, Safai informed him the truck had in fact been in an accident and had frame damage; that Safai also informed him he was "upside down" on the truck; and that, as a result, Safai stated they would add the difference between what Tun owed on the truck and its value, on the one hand, to the balance owed on the vehicle Tun was then purchasing, on the other hand.

Next, Tun testified that he used two credit cards to make a $3,000 down payment on the vehicle; that after the documents were prepared by CA Beemers's finance manager, Joe Hariri, Safai, Tun and Villon went into a back room where Tun alone signed the documents; that Safai did not review any of the details of the documents with Tun as he signed, but rather just pointed to where Tun was to sign; that neither Tun nor Villon had sufficient time to read any of the documents Tun was signing; and that Tun

6

signed a "stack[]" of documents in about 10 minutes, noting the signing went "quick[ly]." Tun admitted that nobody from CA Beemers represented the vehicle came with a warranty.

After taking possession of and driving the vehicle for a "couple of weeks," Tun began to notice problems with its headlights, the sunroof and the brakes. Tun contacted Safai, who agreed to resolve these problems but requested Tun bring the vehicle in on a weekday, rather than on the weekend. Because Tun could not leave the vehicle for service on a weekday, he took it to a mechanic by his home. Tun could not recall the name of the mechanic. According to Tun, it was then he learned for the first time the vehicle had been in a prior accident.

Tun testified that after learning the vehicle had been in an accident, he returned the car to CA Beemers and asked for a different car. Although CA Beemers agreed to give Tun a different car, when CA Beemers informed Tun the monthly payment would be higher, Tun turned down the offer. Tun also refused once again to allow CA Beemers, and its mechanic shop, CBI, to fix the problems he was then having with the vehicle. In a series of text messages between Tun and an agent of CA Beemers a few months after he purchased the vehicle, Tun complained about "the headlight, the leaky [sun]roof and squeaky brakes," but he never mentioned in these messages that he had been sold a frame-damaged car or a car that had been in a collision.

Although Tun claimed the vehicle had frame damage, he testified he continued to drive the car even after filing this lawsuit. In fact, after being told by the mechanic near his home that the vehicle had been in an accident, Tun drove the vehicle for about 18 more months and ended up putting about 27,000 miles on the vehicle. Tun admitted at

7

trial that during the time period he drove the vehicle, it required no "major" repairs and he only had to do "oil change[s], tires, [and] brakes." In fact, at the time of his deposition in this case, Tun admitted the vehicle "ran good."

In or about February 2013, Tun was instructed by an expert hired by Tun's attorney to stop driving the vehicle for reasons unrelated to the prior collision or the resulting alleged unibody damage. Tun in response garaged the vehicle. At the same time, Tun stopped making monthly payments to Wells Fargo as required under the RISC.

Tun testified that in the 10-year period before he purchased the vehicle, he had bought about five or six used cars from other used car dealers. He further testified that before he purchased the vehicle, he had not researched what it would cost if new; that he did not review any cars on the websites of either CA Beemers or California Beemers; that he only looked at the internet advertisement, which advertisement he took to CA Beemers; that the car in the internet advertisement had "custom wheels" that Tun wanted, but that CA Beemers had no such car on the lot; and that "somehow" Tun ended up buying the vehicle that was shown in the internet ad, despite the fact the vehicle did not have the "custom wheels" as shown in the ad.

When he purchased the vehicle, one of the "stack" of documents Tun signed was a "Used Vehicle Delivery Condition Acknowledgement" (acknowledgement). The acknowledgement provided: "UNIBODY SOLD AS IS" in a space that asked to "[d]escribe [d]amage."

At the time of sale, Tun also received a "Buyers Guide" (guide), which he signed in two places. The guide provided in large font that the vehicle was being sold "AS IS -- NO WARRANTY" and that "THIS CAR INVOLVED IN A COLLISION AND ITS [*sic*]

8

SOLD AS IS"; one of Tun's signatures was located immediately below this second notification.

At trial, Tun testified he did not see this notification in the guide and just signed the document because he "trusted" Safai and because he and Villon just wanted to "get out of there [i.e., CA Beemers]." He also testified that, when he subsequently read the guide after he had returned to CA Beemers and complained about the lack of disclosure, he did not understand what the word "collision" meant in connection with this disclosure.

Tun testified no one from Wells Fargo made any representations to him in connection with his purchase of the vehicle. In addition, Tun never contacted Wells Fargo to complain about or question the transaction with CA Beemers. Tun admitted at trial there was nothing wrong with the "financing" of the vehicle.

Safai's testimony sharply differed from that given by Tun. Safai testified that when Tun came to CA Beemers to look for a car, he did not have any advertisement or "paper[s]" with him; that before Tun test drove the vehicle in dispute, Safai told him it was an "accident car" and had "unibody damage"; that a copy of the guide Tun subsequently signed was placed on the window of the vehicle, clearly notifying the public the vehicle had been involved in a collision and the vehicle was being sold "as is"; that Safai pointed out the guide to Tun after Tun showed interest in the vehicle; that even after Safai told Tun the vehicle had been in an accident, Tun wanted to take the vehicle for a test drive; that during the test drive when Tun asked if the vehicle had been in an accident, Safai confirmed it had; that once they got back to CA Beemers after the test drive, Safai presented papers for Tun to sign; that at no time did he or Hariri tell Tun the truck he wanted to trade in had been in an accident or that he was "upside down" on the

9

trade-in; that Safai at no time told Tun that because Tun was "upside down" on the truck, CA Beemers would add the "negative equity" from the trade-in to the purchase price of the vehicle; that with respect to the RISC and despite Tun's testimony otherwise, Safai went over each and every number with Tun, explaining "everything" including the sale price, down payment and financing terms; and that before Tun signed the acknowledgment, Safai explained the vehicle had "unibody damage."

Safai testified he then explained to Tun what "unibody" meant: because, according to Safai, BMW cars do "not have a frame," after a BMW is in an accident it is referred to as "unibody damage . . . because there's unibody construction on the BMW." Safai further testified he did not tell Tun where the damage was on the vehicle because Safai did not know. In addition to the guide that stated the vehicle had been in a collision, Safai showed Tun the acknowledgement where it stated the vehicle had "unibody damage." Safai also told Tun that CA Beemers was not responsible for any reports concerning the vehicle, including the Carfax report.

In contrast to Tun's testimony, Safai recalled Tun test drove more than one car before Tun settled on the vehicle in question. Safai further recalled quoting Tun a price of $36,900 for the vehicle. However, after some negotiation, Safai agreed to drop the price to $36,490. Safai also stated he spent about an hour going over the documents with Tun, as opposed to 10 or so minutes as Tun stated, and at no time did he rush Tun through the signing process, but instead suggested Tun read the documents.

In further contrast to Tun's testimony, Safai testified when Tun returned to CA Beemers a few months after purchasing the vehicle, Tun never complained about the lack of disclosure concerning the vehicle and the fact it had been in an accident or had frame

10

damage. Safai also testified a few weeks thereafter, Tun called and said he was having an issue with the vehicle's "light[s]." Safai told Tun to bring the vehicle in and CA Beemers would fix the issue, but Tun never did. According to Safai, during this phone call Tun again never mentioned he had been misinformed about the vehicle being in an accident or a collision.

Pursuant to a previously executed dealer agreement, Wells Fargo paid dealer about $37,780 for, and received an assignment of, Tun's RISC. Tun's monthly payment under the RISC was about $627.

As particularly relevant to this appeal, the RISC provided in all capital letters: "Notice: Any holder [i.e., Wells Fargo] of this consumer credit contract is subject to all claims and defenses which the debtor [i.e., Tun] could assert against the seller of goods or services [i.e., dealer] obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder."

Under the dealer agreement, Wells Fargo had the right to have dealer repurchase any retail installment sales contract if it became a "non-performing asset," which included the situation when a car loan was not being paid. After Tun filed suit, Wells Fargo exercised that right under the dealer agreement, and CA Beemers in mid-October 2013 paid Wells Fargo about $29,400 and took back the RISC.

Tun filed the instant action in September 2011. He filed a second amended complaint (SAC) in November 2012 alleging 10 causes of action. As noted, he filed a TAC in May 2013.[2] The TAC was similar to the SAC except the TAC included an

_____

2     Wells Fargo and Tun subsequently agreed that Wells Fargo's answer to the SAC would be deemed its answer to the TAC.

11

additional cause of action against Wells Fargo under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.; hereafter UCL) based on DMV licenses fees Tun paid under the RISC.

Key to this appeal, before Wells Fargo answered the SAC, it tendered $15,070 pursuant to section 2983.4. This amount reflected the "total of the payments made by [Tun] under the [RISC] . . . as of January 2013." In response, and in conjunction with filing its answer to the SAC that included a 20th affirmative defense specifically on this issue, Wells Fargo attempted, and ultimately succeeded later that month, in depositing this amount with the clerk of the court.

The 20th affirmative defense provided: "Wells Fargo has tendered to Plaintiff the full amount to which Plaintiff is entitled. Wells Fargo will deposit such sums with the Court. Accordingly, Wells Fargo must be determined to be the prevailing party for purposes of this litigation. (Civ. Code[,] § 2983.4[.])"

Tun in May 2013 filed a motion for judgment on the pleadings. In that motion, he claimed the $15,070 tender by Wells Fargo was an "unconditional confession, a judicial admission by [Wells Fargo] that it has no defense and that the plaintiff is entitled to judgment." Because in Tun's view the tender was a "full and unconditional judicial admission, 'the answer does not state facts sufficient to constitute a defense to the complaint' " for purposes of Code of Civil Procedure section 438.

In opposing that motion, Wells Fargo argued its tender pursuant to its 20th affirmative defense and section 2983.4 "represent[ed] the maximum that Plaintiff can recover under the holder rule, which limits the amount a debtor can recover against a holder of a RISC (such as Wells Fargo) to the amount paid by the debtor under the RISC

12

agreement." Wells Fargo furthered argued that because Tun rejected the tender,[3] his

reasoning it was a judicial admission of liability "turn[ed] the very purpose of section

2983.4 on its head. Rather than codifying a fee-shifting provision aimed at encouraging

settlement, according to Plaintiff, this section codifies a mechanism pursuant to which

Plaintiff can obtain judgment in his favor in an amount he had previously rejected, to be

entitled to attorneys' fees and costs as the prevailing party, and obtain these benefits

without relinquishing the right to continue litigation in order to see if he can obtain an

even higher award."

The court, Honorable Frederick P. Horn, denied Tun's motion. In so doing, the

court ruled a motion for judgment on the pleadings did not result in an entry of judgment

as, for instance, a motion for summary judgment, and thus found Tun's motion

procedurally defective. The court also ruled that with respect to Wells Fargo's 20th

affirmative defense, "[t]he allegations in this defense are sufficient to adequately set forth

an affirmative defense on the part of Wells Fargo," and that "[*w*]*hether plaintiff is

actually entitled to the $15,070 that has been deposited with the Court and/or additional

damages and/or attorneys' fees and costs constitutes an issue that remains to be tried*."

(Italics added.)

The tender issue reemerged shortly before trial in competing in limine motions

filed by Wells Fargo and Tun. The in limine motions were decided by Honorable

Richard Luesebrink, who took over the case from Judge Horn a few days before trial

commenced. Wells Fargo argued Tun should be prevented from introducing evidence

---

3    As we discuss *post*, we conclude Tun had no right to "accept" the tender under
section 2983.4 because a tender under this statute is not a statutory offer to compromise.

regarding the tender and from mentioning it during opening and closing argument. Tun countered Wells Fargo should be precluded at trial from offering any testimony or evidence in which it sought to "deny or reduce its admitted liability" because the tender was a "full and unconditional confession."

The court pretrial ruled the tender was inadmissible. In so doing, the court relied on Judge Horn's previous ruling in connection with Tun's motion for judgment on the pleadings. The court rejected Tun's authority that the tender was a judicial admission, noting that authority was based on a "book" dating back to 1903. The court instead found the case would be submitted to the jury, and the tender issue would have to wait until the resolution of the case.

The parties stipulated the court would hear Tun's equitable claims, including under the UCL and his claim for declaratory relief. Tun's claim on the dealer bond was severed for trial after resolution of the other claims. Tun's claim for "bait and switch" was withdrawn. Tun's remaining claims for breach of contract, fraud (based on intentional false representation and/or concealment of material fact), negligent misrepresentation, violations of the CLRA and the ASFA were heard by the jury.

The jury subsequently returned verdicts in favor of defendants on all causes of action heard by it. The jury also found Wells Fargo was not a holder of the RISC. The trial court subsequently treated the jury's verdict as advisory with respect to Tun's equitable claims and, as such, ruled he had not prevailed on his equitable claims. In so doing, the court once again rejected Tun's contention Wells Fargo's tender was an admission of liability entitling Tun to restitution of $15,070. The court suggested Tun raise that issue on appeal.

14

Tun in response filed new trial and JNOV motions. In his new trial motion, Tun sought relief on four grounds: 1) the court committed an error of law (Code Civ. Proc., § 657, subd. 7) in ruling pretrial that he could not comment to the jury on the Wells Fargo tender; 2) the court abused its discretion and prevented him from receiving a fair trial (*id.*, subd. 1) as a result of its evidentiary rulings, the jury instructions, the verdict form and its resolution of his equitable claims; 3) insufficiency of the evidence (*id.*, subd. 6); and 4) inadequacy of damages (*id.*, subd. 5).

In his JNOV motion, Tun sought relief on three grounds: 1) he was entitled to judgment in the amount of $15,070 on his sixth cause of action for violation of the ASFA, again based on the Wells Fargo tender, which he argued was an admission of liability; 2) he was entitled to judgment on his fifth cause of action for violation of the CLRA because defendants were limited to the defenses set forth therein, none of which they proved; and 3) he was entitled to judgment on his seventh cause of action for violation of the UCL and his eighth cause of action for violation of the False Advertising Act (Bus. & Prof. Code, § 17500 et seq.; hereafter FAL) as a result of defendants' violation of the CLRA.

At an unreported hearing on August 25, 2014, the court stated its tentative was to deny Tun's motions except as to his request for a new trial against Wells Fargo based on the court's error in keeping Wells Fargo's tender from the jury. The court nonetheless requested the parties submit supplemental briefing on the tender issue.

The court at a September 5, 2014 hearing affirmed its tentative when it granted Tun a new trial against Wells Fargo only after the court found it had "erroneously withheld informing the jury of the admission by [Wells Fargo] that it owed [plaintiff]

15

$15,070." The court denied the new trial motion as to dealer and the JNOV as to all defendants.

In its September 8, 2014 minute order, the court summarily ruled as follows:

"1. The Court now denies Plaintiff's Motions for [JNOV] in their entirety.

"2. The Court grants Plaintiff's Motion for New Trial as to Defendant Wells Fargo . . . on the ground that the Court erroneously precluded Plaintiff from advising the jury that Defendant Wells Fargo . . . had tendered and deposited the sum of $15,070.00 as follows:

" 'TWENTIETH AFFIRMATIVE DEFENSE[']

"20. Wells Fargo has tendered to Plaintiff the full amount to which Plaintiff is entitled. Wells Fargo will deposit such sums with the Court. Accordingly, Wells Fargo must be determined to be the prevailing party for purposes of their [*sic*] litigation. (Civ. Code §2983.4)[.]

" 'NOTICE OF PAYMENT' electronically filed 1/25/13.

"PLEASE TAKE NOTICE THAT PURSUANT TO CIVIL CODE §2983.4 AND IN CONJUNCTION WITH THE TWENTIETH AFFIRMATIVE DEFENSE, DEFENDANT WELLS FARGO . . . HEREBY DEPOSITS PAYMENT TO THE CLERK OF THE COURT $15,070 AS THE FULL AMOUNT TO WHICH PLAINTIFF IS ENTITLED.[]

"The Memorandum of Costs submitted by 'Wells Fargo' is ordered stricken in view of the new trial being ordered.

16

"This Matter is ordered transferred to Department C1 for reassignment to another Judge."[4]

The record shows the court subsequently awarded dealer $80,359 in attorney fees after dealer requested about $245,600 in such fees. Tun's notice of appeal, filed before the attorney fee award, was deemed to include that award.

DISCUSSION

I

Error in Law

As noted, Wells Fargo contends the court abused its discretion by granting a new trial. Specifically, Wells Fargo contends there was no error in law on which the court could grant a new trial because it properly denied Tun's in limine motion seeking to inform the jury of the Wells Fargo tender.

A. *Guiding Principles*

Code of Civil Procedure section 657 governs motions for new trials. Among other grounds, a new trial may be granted for an error in law that occurred at the trial and to which the party making the new trial motion objected. (Code Civ. Proc., § 657, subd. 7.)

Where a new trial is granted on the basis of legal error, we must first determine whether the ruling the trial court claims was made in error is as a matter of law truly error. "It is true . . . that, as a general matter, orders granting a new trial are examined for abuse of discretion. [Citations.] [¶] But it is also true that any determination underlying any order is scrutinized under the test appropriate to such determination." (*Aguilar v.*

---

4     The record does not disclose *why* Judge Luesebrink requested the matter be reassigned yet again after he ruled on Tun's new trial and JNOV motions.

17

*Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859.)  Thus, a trial court has no discretion to grant a new trial on the basis of error in law unless its original ruling was erroneous as a *matter of law*.  (*Ramirez v. USAA Casualty Ins. Co.* (1991) 234 Cal.App.3d 391, 397.)

It is axiomatic that when construing a statute, we "independently review questions of statutory construction.  (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387.)  In doing so, we look first to the words of a statute, 'because they generally provide the most reliable indicator of legislative intent.'  (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871.)  We give the words their usual and ordinary meaning (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735), while construing them in light of the statute as a whole and the statute's purpose (*Walker v. Superior Court* (1998) 47 Cal.3d 112, 124 [(*Walker*)]).  'In other words, " 'we do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." ' " '  (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83.) . . .  'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.'  (*People v. Snook* (1997) 16 Cal.4th 1210, 1215.)  'Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation.'  (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103.)"  (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529-530.)  We thus turn to the words of section 2983.4.

Section 2983.4 provides: "Reasonable attorney's fees and costs shall be awarded to the prevailing party in any action on a contract or purchase order subject to the provisions of this chapter regardless of whether the action is instituted by the seller, holder or buyer.

18

Where the defendant alleges in his answer that he tendered to the plaintiff the full amount to which he was entitled, and thereupon deposits in court, for the plaintiff, the amount so tendered*,* and the allegation is found to be true, then the defendant is deemed to be a prevailing party within the meaning of this section."

B. *Analysis*

Wells Fargo on appeal contends the clear purposes of section 2983.4 are to "encourage settlement and protect defendants, and particularly consumer defendants, against unwarranted liability for attorney fees when they 'do the right thing' by paying the amount owed while resisting an unjustified claim for more." Moreover, at oral argument before this court, counsel for Wells Fargo for the *first time* on appeal[5] "conceded" that Tun was in fact entitled to keep the amount of the tender, $15,070, but was not entitled to a new trial.

Tun on appeal contends the use of the word "tender" in section 2983.4 means that Wells Fargo's offer to pay $15,070 was a judicial admission of liability. We disagree with both parties' construction of section 2983.4.

The plain language of Civil Code section 2983.4—including its second sentence—reveals this statute *only* addresses the issue of who is the prevailing party "in any action on a contract or purchase order" subject to the ASFA. There is no language in Civil Code

---

5    Specifically, Wells Fargo in its opening brief argued as follows: "*If* Tun is entitled to a judgment for the tendered $15,070 as a matter of law, as he claims . . . , the judgment may simply be amended to award him that sum. No new trial is necessary as there is no dispute about the pertinent facts." (Italics added.) Wells Fargo further noted the issue of whether Tun was entitled to keep the amount of the tender "*raises only a question of law which this Court or the trial court may resolve on the undisputed facts shown in this record.*" (Italics added.)

section 2983.4 giving a plaintiff the right to keep money tendered by a defendant pursuant to this statute, much less under the facts of this case when the tendering defendant (i.e., Wells Fargo) is found not liable by the trier of fact. Unlike Code of Civil Procedure section 998, a tender under Civil Code section 2983.4 is not a statutory offer to compromise, as the parties appear to contend.

*Hart v. Autowest Dodge* (2007) 147 Cal.App.4th 1258 (*Hart*) informs our decision on this issue. There, the court analyzed section 2988.9—which is nearly identical to section 2983.4—in connection with an action arising under the Vehicle Leasing Act (§ 2985.7 et seq.). Section 2988.9 provides: "Reasonable attorney's fees and costs shall be awarded to the prevailing party in any action on a lease contract subject to the provisions of this chapter regardless of whether the action is instituted by the lessor, assignee, or lessee. Where the defendant alleges in his or her answer that he or she tendered to the plaintiff the full amount to which he or she was entitled, and thereupon deposits in court, for the plaintiff, the amount so tendered, and the allegation is found to be true, then the defendant is deemed to be the prevailing party within the meaning of this section."

In *Hart*, after the first day of trial the court dismissed the plaintiff's complaint with prejudice for lack of evidence. The defendant moved for attorney fees under Civil Code section 2988.9. The defendant in *Hart* argued it was the prevailing party because it had alleged in "its amended answer that it tendered to plaintiff, in an offer to compromise (Code Civ. Proc., § 998), the full amount to which she was entitled ($1,500) and deposited that amount with the court on June 25, 2004, and plaintiff failed to obtain a judgment more favorable than defendant's offer to compromise." (*Hart*, *supra*, 147

20

Cal.App.4th at p. 1261.)  The plaintiff in *Hart* "opposed the motion, arguing [Civil Code] section 2988.9 calls for attorney's fees only when the tender and deposit alleged in the defendant's answer to the complaint 'is found to be true,' and here there was no such finding before entry of judgment, and it was too late to make such a finding after judgment was entered." (*Ibid.*)  The plaintiff thus argued the trial court erred in awarding the defendant about $45,000 in attorney fees.

In affirming the award of attorney fees in favor of the defendant, the *Hart* court found "[b]oth sides misconstrue[d] the statute." (*Hart*, *supra*, 147 Cal.App.4th at p. 1261.)  The *Hart* court analyzed this issue as follows:  "They [i.e., the parties] believe section 2988.9 authorizes attorney's fees only when the defendant has tendered and deposited in court the amount to which the plaintiff is entitled.  Defendant adopted that view in its motion but argued it complied with the tender and deposit requirements.

"However, both sides are wrong.  The second sentence of the statute does not require tender and deposit as prerequisites for an attorney's fees award in addition to the 'prevailing party' requirement of the statute's first sentence.  Rather, the second sentence of the statute merely describes one way in which a defendant will be declared a 'prevailing party,' i.e., where a defendant who concedes owing money but disputes the amount, tenders and deposits the amount to which the plaintiff is entitled, and the allegation (that this is the full amount to which the plaintiff is entitled) *is found to be true by the court*.  It would be nonsensical to require a defendant who has done nothing wrong to tender, deposit, and prove an amount to which plaintiff is 'entitled' in order to recover attorney's fees.

21

" 'When uncertainty arises in a question of statutory interpretation, consideration must be given to the consequences that will flow from a particular interpretation. [Citation.] In this regard, it is presumed the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences. [Citations.]' (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165–1166 [(*Harris*)].)

"Defendant here appears to have conflated Civil Code section 2988.9 with an offer to compromise under Code of Civil Procedure section 998, and defendant apparently deposited in court the amount it offered to settle the suit. However, an offer to settle does not acknowledge liability, whereas [Civil Code] section 2988.9 requires tender and deposit of the amount to which the plaintiff is 'entitled.' " (*Hart*, *supra*, 147 Cal.App.4th at p. 1262, italics added.)

*Hart* correctly recognizes "tender and deposit" is merely one way for a defendant to be deemed the prevailing party under section 2988.9 and, by analogy, under the nearly-identical language in section 2983.4 at issue here. *Hart* also correctly recognizes that, even if a defendant tenders and deposits a certain sum, when the tendering defendant is found not liable, as also turned out to be the case here, that defendant will be deemed the prevailing party under the *first* sentence of the applicable statute, irrespective of the tender.

In sum, we conclude a tender under section 2983.4 is neither an offer to compromise nor an admission of liability. Rather, a tender under the statute is an estimate of the "full amount" of what a tendering defendant believes a plaintiff *may* be "entitled" to in any "action on a contract or purchase order" subject to the ASFA, which, *if* later "found to be true by the court [or trier of fact]" (see *Hart*, *supra*, 147 Cal.App.4th

22

at p. 1262), will make that tendering defendant the prevailing party, despite the plaintiff's recovery of the amount tendered (or any *lesser* amount) against that defendant. (See *Joseph Magnin Co. v. Schmidt* (1978) 89 Cal.App.3d Supp. 7, 12-13 (*Schmidt*) [noting that, in interpreting language in section 1811.1 nearly identical to that in section 2983.4 in connection with an award of attorney fees and costs under the Unruh Act (§ 1801 et seq.), "[a]n installment account debtor who feels his [or her] creditor is entitled to less than the creditor is claiming may tender the lesser amount before suit and thereafter follow the statutory provisions with the reasonable expectation that when he [or she] proves that only the lesser amount is actually due, he [or she] will be entitled to his [or her] attorneys fees and costs"].)

In light of our construction of section 2983.4, we reject the alleged concession of Wells Fargo made during oral argument before this court that Tun allegedly was entitled to keep the $15,070, despite the finding by the jury that Wells Fargo was not liable to Tun. Quite simply, we are not bound to follow the meaning of a statute (or the law) conceded by a party, including one that would lead to "absurd consequences." (See *Harris*, *supra*, 52 Cal.3d at pp. 1165-1166, superseded on another point as noted in *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 664; see also *R.J. Land & Associates Construction Co. v. Kiewit-Shea* (1999) 69 Cal.App.4th 416, 427, fn. 4 [noting the interpretation and applicability of a statute is a question of law and further noting in the "public interest[,] we have discretion to reject [a party's] concession[] because our function to correctly interpret a statute is not controlled by [a party's] concession of its meaning"]; *Bell v. Tri-City Hospital Dist.* (1987) 196 Cal.App.3d 438, 449 [noting a reviewing court " 'is not bound to accept concessions of parties as establishing the law

23

applicable to a case' "], disapproved on another ground as stated in *State of California v. Superior Court* (2004) 32 Cal.4th 1234, 1244.)

Tun's common law-based interpretation that the word "tender" in section 2983.4 constitutes a judicial admission of liability would turn this statute and other similarly worded consumer protection statutes[6] on their proverbial heads. (See *Harris*, *supra*, 52 Cal.3d at pp. 1165-1166; see also *Walker*, *supra*, 47 Cal.3d at p. 124 [noting construction of a statute requires a court to review its words in light of the statute as a whole].)

Indeed, if Tun is correct that a tender made pursuant to section 2983.4 was a judicial admission of liability on a cause of action brought under the ASFA, then no defendant would ever seek to invoke the statutory right afforded such a party under this statute. We decline to adopt the interpretation sought by Tun, as it clearly would thwart the Legislature's purpose of discouraging litigation of excessive and improper claims. (See *Schmidt*, *supra*, 89 Cal.App.3d Supp. at pp. 12-13.)

We separately conclude the trial court did not have discretion to grant a new trial as to Wells Fargo only following the jury verdict in favor of all defendants because Wells Fargo's liability, if any, was derivative to that of dealer, inasmuch as Wells Fargo was merely the "holder" of the RISC at issue in this case, as the RISC itself expressly recognized (as summarized *ante*). (See *Lafferty v. Wells Fargo Bank* (2013) 213 Cal.App.4th 545, 560 (*Lafferty*) [noting that " '[a] creditor or assignee of the contract is thus subject to all claims or defenses that the consumer could assert against the seller' "

---

6  See, e.g., sections 1717, subdivision (b)(2), 1811 and 2988.9.

24

and noting " '[t]he Holder Rule does not create any new claims or defenses for the consumer; it simply protects the consumer's existing claims and defenses' "].)

Here, the record shows the jury returned a defense verdict for dealer. As such, and because Wells Fargo's liability to Tun was derivative of dealer's liability, Wells Fargo also was entitled to a defense verdict as the (one-time) holder of the RISC. (See *Lafferty*, *supra*, 213 Cal.App.4th at p. 563 [noting that "[a]lthough the Holder Rule allows claims against sellers to be asserted against lenders, the Holder Rule does not itself provide a cause of action," and, thus, a buyer "must 'borrow' a cause of action from another statute or common law source to assert a claim against [a lender]"]; see also *Music Acceptance Corp. v. Lofing* (1995) 32 Cal.App.4th 610, 622 [noting a holder "stands in the shoes" of a seller and is liable, if at all, to the same extent as the seller]; *City of Los Angeles v. Superior Court* (1978) 85 Cal.App.3d 143, 154 [citing *Bernhard v. Bank of America* (1942) 19 Cal.2d 807, 812-813 in noting a "judgment in favor of a defendant for whom another party is vicariously liable is res judicata as to that other party if the judgment was based on the merits"].) For this additional reason, we conclude the court did not have discretion to grant a new trial as to Wells Fargo following the jury verdict in favor of dealer.[7]

---

[7] In light of our decision, we need not decide Wells Fargo's alternate contention that Tun could not show the (alleged) error of law was prejudicial; that is, it effected a substantial right and prevented him from obtaining a fair trial. (See *Bristow v. Ferguson* (1981) 121 Cal.App.3d 823, 826.)

II

Other Grounds to Support New Trial Motion

Tun contends other grounds separate from the tender issue support the court's granting of the new trial motion.[8]  We turn now to these separate grounds.

A.  *Evidentiary Issues*

Tun initially contends the court abused its discretion and thus erred when it ruled in limine to exclude evidence of other alleged instances when dealer "sold vehicles without disclosing their history of frame damage" to show a "pattern or practice" by dealer to support his UCL claim.  We disagree.

We note Tun made this contention in summary fashion (i.e., in a few sentences) and without any legal authority in support.  (See *Berger v. Godden* (1985) 163

---

[8]      Although Tun in his new trial motion raised inadequate damages and insufficiency of the evidence as grounds in support of that motion, because the order does not specifically state it is granted based on such grounds, we cannot affirm the order on that basis.  (See Code Civ. Proc., § 657 [providing in last paragraph: "On appeal from an order granting a new trial the order shall be affirmed if it should have been granted upon any ground stated in the motion, whether or not specified in the order or specification of reasons, *except that (a) the order shall not be affirmed upon the ground of the insufficiency of the evidence to justify the verdict or other decision, or upon the ground of excessive or inadequate damages, unless such ground is stated in the order granting the motion* and (b) on appeal from an order granting a new trial upon the ground of the insufficiency of the evidence to justify the verdict or other decision, or upon the ground of excessive or inadequate damages, it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons" (italics added)]; see also *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 634 [noting "California courts have consistently required strict compliance with section 657" of the Code of Civil Procedure]; *Collins v. Sutter Memorial Hospital* (2011) 196 Cal.App.4th 1, 17 [noting the "right to move for a new trial is a creature of statute and the procedure prescribed by law must be closely followed"].)

Cal.App.3d 1113, 1117 (*Berger*) [noting the "failure of appellant to advance any pertinent or intelligible legal argument . . . constitute[s] an abandonment of the [claim of error]"]; *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 (*Atchley*) [noting when an appellant "offer[s] no authority, nor analysis, for [a] proposition," the point "is deemed to be without foundation and requires no discussion by the reviewing court"].)  Hence, Tun's conclusory claim of error fails.

Moreover, whether dealer engaged in a "pattern or practice" of allegedly selling cars without disclosing their history of frame damage for purposes of Tun's UCL claim, which is equitable in nature and which was decided by the court following the jury verdicts, was irrelevant to the issues tried to the jury that were the main subject of his new trial motion.  (See *Hodge v. Superior Court* (2006) 145 Cal.App.4th 278, 284 [noting remedies under the UCL are purely equitable, and, thus, there is no right to a jury trial on such a claim].)

Finally, in reviewing the merits of this claim we note the citation to the evidence proffered by Tun to show this "pattern or practice" does not involve multiple cars, as he advocates in his brief, but instead only one car.  In addition, other than taking Tun at his word, his citation to the evidence in the record does *not* disclose that this one car bought by California Beemers was sold by California Beemers or CA Beemers without disclosure of the "frame/unibody damage."  (See *Berger*, *supra*, 163 Cal.App.3d at p. 1117; *Atchley*, *supra*, 151 Cal.App.3d at p. 647.)  For this separate reason, we reject the contention the court erred in ruling in limine to exclude this evidence.

Next, Tun contends the court erred when it ruled to exclude evidence showing the vehicle in question was advertised on the California Beemers website for $34,900, which

27

was slightly less than he paid for the vehicle. Tun contends this evidence established his false advertising claim under the CLRA and the FAL. Again, we disagree.

As was the case above, Tun provides no legal authority to support this contention, nor does he show how this ruling, even if in error, prejudiced him. (See *Berger*, *supra*, 163 Cal.App.3d at p. 1117; *Atchley*, *supra*, 151 Cal.App.3d at p. 647.) For this reason alone, we reject his contention the court erred in excluding this evidence.

Reaching the merits, as noted the proffered evidence was taken from the California Beemers website. However, Tun testified he never looked at the California Beemers website (or at the website for CA Beemers, for that matter) before he purchased the vehicle. As such, Tun cannot establish he relied on the one-page advertisement of the vehicle in connection with his CLRA and FAL claims. (See *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1367 (*Durell*) [noting relief under the CLRA is " ' "limited to those who suffer damage, making causation a necessary element of proof" ' " and noting a " 'misrepresentation is material for a plaintiff [under the CLRA] *only if there is reliance*—that is, " ' "without the misrepresentation, the plaintiff would not have acted as he [or she] did" ' " ' " (italics added)]; *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 326-327 & fn. 10 (*Kwikset*) [noting to state a claim under the FAL, a plaintiff must plead and prove facts showing actual reliance, that is, that the plaintiff suffered economic injury as a result of his or her reliance on the truth and accuracy of the defendant's representations].)

What's more, Assar testified that cars advertised on the CA Beemers website were available for wholesale *only* and that the advertised price for such cars by design was less than the retail prices because wholesalers had to make a profit. And, although Tun

28

claimed he brought an internet ad concerning the vehicle that matched the wholesale price, Safai testified Tun had no such "paper[s]" or advertisement with him when he came to the lot to look at cars.

In any event, the record shows Tun in fact used the disputed advertisement evidence in cross-examining Assar. As such, we conclude that even if it was error to exclude this one-page advertisement from the California Beemers website, we further conclude that error was not prejudicial. (See Cal. Const., art. VI, § 13 [providing: "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of . . . improper admission or rejection of evidence, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].)[9]

B. *Jury Instructions and Verdict Form*

Tun contends the court erred when it excluded his proposed special jury instructions regarding the effect of the Wells Fargo tender. In light of our conclusion *ante* on this issue, we reject his contention.

Tun also contends the last question on the verdict form was ambiguous and prejudicial. This question asked: "Is Wells Fargo Dealer Services *any* holder of Plaintiff's Retail Installment Sales Contract?" (Italics added.) Eleven of the 12 jurors answered this question "No."

---

[9] In light of our decision on this issue, we decline to address Wells Fargo's alternate contention that the document or documents from the California Beemers website were also inadmissible because they were not properly authenticated.

As summarized *ante*, before trial dealer repurchased the RISC at issue in this case after Tun stopped making payments on the vehicle. Although Wells Fargo argued, and the jury subsequently found, Wells Fargo was not the holder of the RISC at the time of trial, we conclude it is wholly unnecessary to resolve the issue of whether the transfer of the RISC back to dealer relieved Wells Fargo of any liability as a holder. Indeed, as noted *ante*, when the jury rendered verdicts in favor of dealer on all causes of action heard by the jury, those verdicts as a matter of law absolved Wells Fargo of liability as a result of it being (at one time) a holder of the RISC.[10]

C. *Equitable Claims*

Finally, Tun claims the court erred in not considering "tender and deposit as admissions when ruling on [his] equitable claims," after the court granted in part his new trial motion only as to Wells Fargo. In light of our conclusion that the court did not commit an error of law when it ruled in limine that Tun could not comment to the jury on the Wells Fargo tender made pursuant to section 2983.4, we reject his contention the court erred in not considering the tender with respect to his equitable claims.

III

Cross-appeal

A. *Denial of New Trial Motion as to Dealer*

Repeating the same argument, Tun contends the court erred when it granted the new trial motion based on the tender under Civil Code section 2983.4 as to Wells Fargo

---

[10]    In light of our decision, we decline to address Wells Fargo's alternate contention that Tun forfeited this claim of error based on his (alleged) failure to object at trial to the verdict form.

30

but *not* as to dealer. Again, we reject this contention for the reasons already discussed. (See Code Civ. Proc., § 657, subd. 7; Civ. Code, § 2983.4.)

B. *JNOV*

Tun again relies on the $15,070 tender by Wells Fargo to support his contention the court erred in denying his JNOV motion because he was entitled to judgment as a matter of law on his ASFA cause of action. As before, we disagree with this contention in light of our conclusion the tender was not a judicial admission of liability. (See § 2983.4.)[11]

Next, Tun contends he is entitled to judgment as a matter of law on his CLRA claim because defendants were limited to the defenses set forth in this statutory scheme, none of which, he further contends, they proved. However, in making this assertion, Tun assumes that the record contains no substantial evidence to support the jury's threshold finding he did not state a claim under the CLRA.

As before, we reject this contention because Tun failed to address—much less show—whether there was no substantial evidence in the record to support the jury's finding that he did not prove the elements of a CLRA claim. As such, the issue of what defenses defendants could or could not rely on in connection with this claim is moot.

Moreover, we reject this contention for the additional reason there is substantial evidence in the record to support the jury's verdict on Tun's CLRA cause of action. It is beyond dispute that a court's " ' "power to grant a judgment notwithstanding the verdict is

---

[11]    In light of our decision, we deem it unnecessary to resolve other arguments made by dealer, including that Tun's motion for JNOV in connection with his ASFA cause of action was limited to Wells Fargo and, thus, did not include dealer.

31

identical to [its] power to grant a directed verdict [citations].  The [court] cannot reweigh the evidence [citation], or judge the credibility of witnesses.  [Citation.]  . . . 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is *no substantial evidence* to support the verdict.  *If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied*.' " ' "  (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 226–227, second italics added (*Sole Energy*).)

Here, as noted *ante*, there was a conflict in the evidence whether Tun actually relied on the advertisement at the time of purchase of the vehicle.  (See *Durell*, *supra*, 183 Cal.App.4th at p. 1368 [noting a " 'misrepresentation is material for a plaintiff [under the CLRA] only if there is reliance' "].)  Indeed, Safai testified Tun did not have the advertisement or other "paper[s]" with him when he and Villon came to the lot on the day in question.  Tun also admitted he did *not* review the inventory of cars on the websites of either CA Beemers *or* California Beemers before he went to the CA Beemers lot and purchased the vehicle.

What's more, there was substantial evidence that *before* Tun purchased the vehicle, he was *repeatedly* told it had been in a collision and sustained frame/unibody damage.  Documentary evidence, including the acknowledgement and guide discussed *ante*, corroborated the (implied) finding of the jury that Tun was made aware *before* he purchased the vehicle that it had been in a collision.  As such, we conclude there was substantial evidence in the record supporting the (implicit) finding of the jury that Tun did not, for purposes of his CLRA claim, rely on the advertisement when he purchased

32

the vehicle. (See *Durell*, *supra*, 183 Cal.App.4th at p. 1368.) We thus further conclude Tun was not entitled to JNOV on this claim.

We also reject Tun's contention he was entitled as a matter of law to judgment on his UCL and/or FAL claims. That Tun claims he viewed the vehicle advertisement, which (allegedly) was misleading, does not ipso facto mean he is entitled to judgment as a *matter of law* on one or more of these claims.

Indeed, as summarized *ante*, the evidence was conflicting whether Tun *relied* on the advertisement in connection with his purchase of the vehicle. (See *Sole Energy Co.*, *supra*, 128 Cal.App.4th at p. 227 [noting " ' " '[i]f there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied' " ' "].) As such, we conclude the court properly denied his JNOV motion with respect to his UCL and/or FAL claims. (See *Kwikset Corp.*, *supra*, 51 Cal.4th at pp. 326-327 & fn. 10.)

C. *Attorney Fees*

Tun next contends the award of attorney fees in favor of dealer must be reversed as dealer should not have been deemed the prevailing party because the court also should have granted his new trial and/or JNOV motions with respect to dealer. In light of our decision in this case, we reject this contention.

Finally, Tun contends the attorney fee award should be reversed because the court failed to apportion that award. However, the record belies this contention. In fact, the record shows dealer provided the court with evidence of apportionment of fees in the sworn supplemental declaration of dealer's counsel. In that declaration, counsel testified that 30 percent of the total billing was due to the contract claims, in which fees were

33

recoverable under the RISC, and to the ASFA claims, in which fees were recoverable under section 2983.4. Counsel further testified the "false advertising and CLRA claims required the majority of defense counsels' work."

The record shows the court denied dealer attorney fees under the CLRA. In so doing, the court found there was insufficient evidence to prove a lack of good faith by Tun in asserting this claim (see § 1780, subd. (e)), noting Tun was "persuaded" by legal counsel that "his case was viable despite substantial evidence to the contrary." The court nonetheless awarded dealer $80,359, or *30 percent* of the $245,597 fees it sought.

We conclude the court properly exercised its broad discretion (see *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1094–1095 (*Drexler*) when it awarded only 30 percent of the fees sought by dealer, as a result of dealer's concession that the "majority" of the work in this case involved defending Tun's false advertising and CLRA claims. As such, we reject Tun's contention the fees awarded dealer allegedly "overlap[ped]" with the fees attributable to defending the false advertising and CLRA claims that were denied by the court.

Further, we note Tun does not dispute the amount of fees awarded dealer or its counsel's $175 hourly rate. As our high court has explained: " 'The "experienced trial judge is the best judge of the value of professional services rendered in his [or her] court, and while his [or her] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong' "—meaning that it abused its discretion. (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49.)" (*Drexler*, *supra*, 22 Cal.4th at p. 1095.) We thus reject Tun's challenge to the attorney fees awarded dealer.

DISPOSITION

The order granting Tun's new trial motion as to Wells Fargo only is reversed. The order denying (i) Tun's new trial motion as to dealer and (ii) his JNOV motion as to all defendants is affirmed. The trial court is directed to enter judgment in favor of Wells Fargo. Defendants Wells Fargo and dealer are entitled to their costs of appeal.

BENKE, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.