Filed 4/9/20; reposting corrected document

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D074647 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. PLAN2829) |
| ARNELL WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kathleen Lewis, Judge. Affirmed.

Law Office of Christine M. Aros and Christine M. Aros for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting, Paige Hazard and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part B.

Defendant Arnell Williams appeals from the trial court's order denying his motion (motion) to dismiss the petition for revocation (petition) filed by the California Department of Corrections and Rehabilitation (CDCR). Defendant contends the court erred when it confirmed the prerelease determination of CDCR that he was a "high-risk sex offender" requiring him to be supervised by parole under Penal Code[1] section 3000.08, subdivision (a)(4), and not be placed in postrelease community supervision (PRCS) under section 3450 et seq.

As we explain, we independently conclude defendant was subject to parole supervision as a result of his 1984 convictions for forcible rape, rape in concert, and robbery, which qualify as serious and/or violent felonies within the meaning of subdivision (a)(1) and (2) of section 3000.08, respectively. As such, we deem it unnecessary to determine whether defendant was also subject to such supervision as a result of his high-risk sex offender classification. Affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

In connection with his pending release from prison in mid-June 2018, defendant maintained he was to be supervised under PRCS because his most recent convictions were for a nonviolent offense. After defendant's release, CDCR filed the petition because he refused to comply with the parole condition requiring him to affix to his person "an electronic, global positioning system (GPS), or other monitoring device" as a result of CDCR's determination he was a high-risk sex offender based on sex offenses he

---

[1] All further statutory references are to the Penal Code unless noted otherwise.

committed in January 1984, as discussed *post*. In early July 2018, defendant rejected CDCR's offered disposition of 180 days in confinement in a county jail, and requested a parole revocation evidentiary hearing.

In connection with that hearing, defendant filed his motion in early August 2018. Attached to the motion was an 11-page report prepared by defendant's expert; the expert's curriculum vitae; defendant's Static-99 test; and excerpts of Static-99R coding rules, among other documents. In the motion, defendant argued his Static-99R score of 5, which put him in the high-risk sex offender category, was unreliable because he was only 16 years old when he committed the index sex offenses; and thus, according to defendant's expert, the Static-99R was an improper assessment tool to predict his likelihood of sexual recidivism. He further argued that, even if the Static-99R was the proper assessment tool, his score was unreliable because CDCR delayed in administering the test, and failed to account for his current age and for the length of time he had spent in the community without committing additional sex offenses.

Defendant filed a supplemental brief in support of his motion. In this brief, he argued that section 3000.08 was the "controlling authority" in determining whether a person released from state prison should be supervised by parole or PRCS. He further argued that subdivision (a) of this statute, which, when applicable, requires parole supervision, did not apply to him because he was neither a high-risk sex offender nor were his most recent convictions for "drug sales and transportation" serious or violent felonies. As such, defendant argued he was not subject to parole supervision, was not required to wear a GPS device, and was instead subject to PRCS.

3

In opposing defendant's motion, the People claimed he had been properly designated as a high-risk sex offender and thus, was subject to parole supervision. The People also claimed—as they do on appeal—that whether defendant was subject to parole supervision was "within the sole discretion of CDCR"; that the trial court therefore was "statutorily prohibited from terminating [defendant's] parole"; and that the court's role at the revocation hearing was merely to act as the trier of fact in determining whether defendant violated parole by refusing to wear a GPS device.

At the September 5 evidentiary hearing, the court initially heard testimony from defendant and his parole agent. The court then found by a preponderance of the evidence that defendant had violated parole by refusing to comply with the GPS monitoring condition.

The court next turned to the issue of whether defendant was subject to parole supervision. The court noted it had read defendant's motion and the attachments thereto, the People's opposition, the supplemental brief and materials filed by defendant, and the parties' stipulation of various facts.

Regarding the parties' stipulation, the court read the following into the record: 1) defendant was born on July 7, 1967; 2) defendant committed his "index sexual offenses" on January 22, and January 24, 1984; 3) defendant was 16 years old when he committed the sex offenses; 4) defendant pleaded guilty on August 30, 1984, to one count of forcible rape, one count of rape in concert, and one count of robbery; 5) defendant on March 24, 1996, was 28 years old when he was paroled on these offenses; 6) defendant was sentenced in January 2005 to three years in prison for failing to register as a sex offender,

4

in violation of former section 290, subdivision (g)(2), and was paroled for that offense in January 2006; 7) defendant pleaded guilty in March 2008, and sentenced to 30 days in jail, for the misdemeanor offense of resisting a peace officer; 8) defendant was "arrested for possession for sales and sales of cocaine base" in February 2011, in violation of (former) Health and Safety Code sections 11351.5 and 11352; 9) shortly before defendant's release on the "drug sales case," CDCR in February 2018 administered the Static-99R test, which resulted in a score of "5," although defendant scored a "1," or "low risk," on the "California Risk Assessment level"; and 10) defendant on June 16, 2018, was 50 years old when he was released from state prison on the 2011 "drug sales case."

After receiving additional testimony including from defendant's expert and another witness from CDCR, and hearing the argument of counsel, the court confirmed its tentative ruling and found it had "jurisdiction" to hear defendant's motion, relying in part on *People v. Toussain* (2015) 240 Cal.App.4th 974 (*Toussain*), and sections 1203.2, subdivision (b)(1), 3000.08, and 3056, subdivision (a). The court also found that, pursuant to various statutes, CDCR was required to evaluate defendant "under the risk assessment tools for sex offenders"; that with respect to the classification defendant was a high-risk sex offender, the Static-99R was a "tool" and not the "law," and was a "reliable" and "objective" indicator on this issue; and that in the instant case, CDCR followed its own policies, regulations, and the applicable statutory scheme in assessing defendant and in determining he qualified as a high-risk sex offender.

The court also rejected defendant's argument that use of the Static-99R was unwarranted because he committed the index offenses when he was 16 years old. The

5

court noted that this assessment tool was not even in existence when defendant was paroled on the index crimes; and that, in any event, it disagreed with defendant's expert that the tool was inaccurate if used on a person who committed the index crimes when he or she was 16 years old. Finally, the court found that it lacked the authority to "rescore" defendant using the Static-99R, and that, even if it had such authority, it would not do so.

## DISCUSSION

A. *Overview of Realignment*

The Legislature in 2011 enacted and amended " ' "a broad array of statutes concerning where a defendant will serve his or her sentence and how a defendant is to be supervised on parole," ' referred to generally as the realignment legislation. [Citation.]" (See *People v. Zamudio* (2017) 12 Cal.App.5th 8, 13 (*Zamudio*).) "The overall purpose of the realignment legislation was to decrease recidivism and improve public safety, while at the same time reducing corrections and related criminal justice spending. [Citation.]" (*Ibid.*)

"As enacted by the realignment legislation, new section 3000.08 and an amended version of section 1203.2 became central elements of the system for parole supervision and revocation. Together with [California Rule of Court,] rule 4.541 [governing the contents of supervising agency reports], these statutes [and this rule] provide the framework for parole eligibility, enforcement of parole supervision conditions and procedures to revoke parole in the event of a violation." (*Zamudio*, *supra*, 12 Cal.App.5th at p. 13.)

6

B. *The Court Had the Authority to Rule on Defendant's Motion*

We first address the threshold issue whether the trial court lacked "jurisdiction" to modify defendant's supervision from parole to PRCS, as the People claim, because that authority rests exclusively with CDCR. The People claim defendant's appeal should be dismissed, he should be required to exhaust his administrative remedies through CDCR, and only then, if necessary, challenge in court any such determination through a writ of habeas corpus.

This identical issue was recently addressed and rejected by this court in *People v. Johnson* (2020) 45 Cal.App.5th 379 (*Johnson*). There, we held a court had the authority or "jurisdiction" to rule on a defendant's motion to dismiss the petition to revoke his parole and transfer him from parole supervision to PRCS. (*Id.* at pp. 399–340, fn. 13.) In reaching our decision, we interpreted section 1203.2, subdivision (b)(1), which provides in relevant part as follows: "Upon its own motion or upon the petition of the supervised person, the probation or parole officer, or the district attorney, the court may modify, revoke, or terminate supervision of the person pursuant to this subdivision, *except that the court shall not terminate parole pursuant to this section*." (Italics added.)

In *Johnson*, we concluded that the Legislature intended the above italicized language to prohibit the trial court from terminating parole as a *sanction* for violating the conditions of parole (*Johnson*, *supra*, 45 Cal.App.5th at p. 405); and thus, that such language did not bar a court from transferring a defendant from parole supervision to PRCS when a defendant has shown he or she is not subject to any of the qualifying crimes set forth in subdivision (a) of section 3000.08. (*Johnson*, at p. 405.)

7

To support our decision, we noted subdivision (a) of section 1203.2[2] had the identical italicized language that appears in subdivision (b) of this statute. (*Johnson*, *supra*, 45 Cal.App.5th at pp. 396–397.) Because subdivision (a) of section 1203.2 described the *sanctions* available to a court, *other than* termination of parole for a violation of the conditions of parole or for other bad acts, we concluded the Legislature intended the identical language in subdivisions (a) and (b) of this statute to have the same meaning. (*Johnson*, at p. 396; see *People v. Jones* (1988) 46 Cal.3d 585, 595 [noting " '[i]t is presumed, in the absence of anything in the statute to the contrary, that a repeated phrase or word in a statute is used in the same sense throughout' "]; see also *People v. Montiel* (2019) 35 Cal.App.5th 312, 321 [interpreting "economic loss" in various subdivisions of section 1202.4 "consistently" in affirming a restitution award to the mother of an eight-year-old victim who was molested by the defendant].)

Our conclusion in *Johnson* was further buttressed by the purpose of the Legislature's enactment of realignment. If a court had the authority to terminate parole altogether as a sanction for a violation, that remedy would undermine the purpose of realignment, which was to prevent a parolee from returning to prison. (*Johnson*, *supra*,

---

2       Subdivision (a) of section 1203.2 provides in relevant part: "Upon rearrest, or upon the issuance of a warrant for rearrest, the court may revoke and terminate the supervision of the person if the interests of justice so require and the court, in its judgment, has reason to believe from the report of the probation or parole officer or otherwise that the person has violated any of the conditions of his or her supervision, has become abandoned to improper associates or a vicious life, or has subsequently committed other offenses, regardless of whether he or she has been prosecuted for those offenses. *However, the court shall not terminate parole pursuant to this section*." (Italics added.)

45 Cal.App.5th at p. 397 [noting as part of realignment, the Legislature intended to provide the return of a parolee as a sanction for a violation "only for a very limited class of parolees," as set forth by statute, and further noting that, except in those instances, subdivision (f)(2) of section 3000.08 provides that the most extreme custody-related sanction the trial court may issue for a parole violation is confinement in county jail for up to 180 days]; see § 3056, subd. (a) [providing that "[p]risoners on parole shall remain under the supervision of the department but shall not be returned to prison"].)

We agree with the reasoning in *Johnson* and conclude the language "shall not terminate parole" in subdivision (b)(1) of section 1203.2 means a court, absent circumstances not applicable here, cannot return a parolee to prison as a *sanction* for, or a *consequence* of, violating parole; but that a court retains the authority to hear and decide a motion to transfer a defendant from parole to PRCS upon a showing the defendant did not commit any of the qualifying crimes set forth in subdivision (a) of section 3000.08.

C. *Defendant Was Subject to Parole Supervision because his 1984 Crimes Qualified as Serious and/or Violent Felonies under subdivision (a)(1) and (2), respectively, of Section 3000.08*

1. Additional Background Regarding Defendant's 1984 Convictions

The record includes a recitation of defendant's criminal history, including, as relevant here, the offenses he committed in 1984. It provides: On January 22, 1984, "[a]t approximately 11:45 p.m., [victim 1] was alone in her residence when she answered a knock at the door. She opened the door, believing it was her roommate, [victim 2]. Instead, it was co-defendant Brooks who barged into her home holding a black revolver. He pointed the gun at [victim 1] and told her to lie down and cover her face. [Defendant]

9

Mr. Williams and another co-defendant entered the home and asked if anyone else was home. [Victim 1] claimed other people were home, but the defendants checked the rooms in the house and discovered no one else was there. One of the subjects said, 'Hey, we're going to be here a while' and all three covered their faces with bandanas and placed socks over their hands.

"The subjects went through the rooms of the house, ransacked drawers and cabinets, and continually asked when [victim 1's] roommate was returning. They told the victim they needed a car and had her telephone her roommate, [victim 2], in order to get her to come home. The subjects continued to ransack the rooms and began drinking alcohol. One of the subjects approached [victim 1], unbuttoned his pants, removed his penis and told her to, 'Put your mouth on this.' When [victim 1] refused, she was pistol whipped in the face with the revolver. [Victim 1] became very nervous, began hyperventilating, and vomited. Co-defendant Brooks opened the cylinder of the gun he was holding, removed the bullets and showed them to [victim 1]. The other subject then told her, 'Don't relax too much, I still have a knife.'

"When [victim 2] arrived home, she was confronted by one of the subjects who· was standing behind the front door. He pointed a black revolver at her and ordered her to get on the floor. [Victim 2] was asked if she had any dope or guns. She went into the bathroom and one of the subjects followed her. Once inside the bathroom, the subject unbuttoned his pants, removed his penis, and shoved it towards [victim 2]. She refused and was taken from the bathroom to the bedroom where her hands were tied behind her back. Another subject took [victim 1] to another bedroom and tied her hands behind her

10

back. The subjects loaded the stolen items from the residence into [victim 2's] car and left. [Victim 1] was able to work her hands free, untied her roommate's hands, and they went next door to call the police.

"January 24, 1984: The C[.] Family: [¶] Mr. and Mrs. C[.] were asleep in their bed when they were awakened around 1:40 a.m. by a voice saying, 'Don't move and don't make a sound.' (Their three-year-old son was also asleep in the house in another room.) Mr. C[.] saw the barrel of a gun and men with stocking masks over their faces. He ultimately saw two black males holding handguns; one [of the guns] was described as a large black revolver with a six-inch barrel and white pistol grip.

"Mr. and Mrs. C[.] were immediately ordered to lie face-down on the floor and Mr. C[.] was taken into an empty bedroom where his feet and hands were bound, and he was gagged. A gold chain and yellow gold band were removed from Mrs. C[.] before she was taken into the master bedroom and forcibly raped by five of the subjects. She told the reporting officer, 'I don't remember how many of them there were, I just remember that they had a gun, they put a pillow over my head and held my legs and arms while they took turns raping me.'

"She was also sodomized by at least three of the men. She could not be certain if all five sodomized her as she lost consciousness at least once during the sodomy. One of the subjects inserted the barrel of a handgun into her anus during the sexual assault.[3]

---

3    Defendant in his motion admitted he was the one who sodomized Mrs. C. "with a gun barrel."

11

Also, one of the subjects attempted to have Mrs. C[.] orally copulate him. The subjects then tied up Mrs. C[.] with a phone cord and gagged her.

"The residence was ransacked and the C[.]'s property was taken and placed into their vehicle, which was then stolen. Mr. and Mrs. C[.] eventually untie[d] themselves and contacted police from a neighbor's house. Mrs. C[.] was taken to a hospital for her injuries and a medical report indicated she may have been pregnant at the time the attack occurred.

"During the investigation of these crimes, co-defendant Brooks and a minor admitted their involvement in the C[.] case. Brooks admitted helping Mr. Williams pry a corner of the C[.]'s garage door open to gain entry into the house. Mr. Williams had the gun and was the one who forced the family to lie on the floor. All of the subjects participated in the rape. A search of Mr. Williams' home revealed a black BB gun with a six-inch barrel and white hand grip as described by Mrs. C[.] She also positively identified Mr. Williams as being the intruder with the black gun with [the] white hand grip.

"On August 30, 1984, Mr. Williams pled guilty . . . to one count of rape in concert ([former] §§ 261(2) & 264.1), one count of forcible rape ([former] § 261(2)), and one count of robbery of an inhabited dwelling (§§ 211 & [former] 213.5). The remaining counts, including the firearm allegation, were dismissed pursuant to the plea bargain. [Defendant] was sentenced to 23 years in state prison.

"On March 24, 1996, [defendant] was paroled from state prison at the age of 28."

12

2. <u>Statutory Overview</u>

As noted *ante*, the parties to this appeal dispute whether defendant qualified as a high-risk sex offender under subdivision (a)(4) of section 3000.08. Subdivision (a) of this statute provides in relevant part: "A person released from state prison prior to or on or after July 1, 2013, after serving a prison term . . . for any of the following crimes is subject to parole supervision by the Department of Corrections and Rehabilitation and the jurisdiction of the court in the county in which the parolee is released, resides, or in which an alleged violation of supervision has occurred, for the purpose of hearing petitions to revoke parole and impose a term of custody: [¶] (1) A serious felony as described in subdivision (c) of Section 1192.7. [¶] (2) A violent felony as described in subdivision (c) of Section 667.5. [¶] . . . [¶] (4) Any crime for which the person is classified as a high-risk sex offender. …"

Subdivision (b) of section 3008.08 provides: "Notwithstanding any other law, all other offenders released from prison shall be placed on postrelease supervision pursuant to Title 2.05 (commencing with Section 3450)."

On this court's own motion, we sought supplemental briefing from the parties regarding whether subdivision (a)(1) and/or (2) of section 3000.08 apply here based on defendant's 1984 convictions for forcible rape, rape in concert, and/or robbery. The parties submitted supplemental briefs, separately claiming (with little legal support) that subdivision (a)(1) and (2) allegedly did not apply because only defendant's most recent

13

commitment offense determines parole eligibility under the language of these two provisions.[4]

This question presents an issue of statutory interpretation, which issue we review de novo. (*People v. Morales* (2018) 25 Cal.App.5th 502, 509.) It is axiomatic that the " ' "goal of statutory construction is to ascertain and effectuate the intent of the Legislature." ' [Citation.] In approaching this task, we must first look at the plain and commonsense meaning of the statute because it is generally the most reliable indicator of legislative intent and purpose. [Citation.] If there is no ambiguity or uncertainty in the language, the Legislature is presumed to have meant what it said, and we need not resort to legislative history to determine the statute's true meaning." (*People v. Cochran* (2002) 28 Cal.4th 396, 400–401; *People v. Birkett* (1999) 21 Cal.4th 226, 231 [noting that "[w]e must follow the statute's plain meaning, if such appears, unless doing so would lead to absurd results the Legislature could not have intended"].)

Moreover, it " 'is an established tenet of statutory construction that separate items in a statute should be given meaning with reference to the whole, and that *each* word and phrase in the statute should be interpreted "to give meaning to every word and phrase in

---

[4] The People in their supplemental brief made the additional argument that, regardless of defendant's classification as a high-risk sex offender, he also was subject to parole supervision pursuant to subdivision (*l*) of section 3000.08. This subdivision provides, "Any person released to parole supervision pursuant to subdivision (a) shall, regardless of any subsequent determination that the person should have been released pursuant to subdivision (b), remain subject to subdivision (a) after having served 60 days under supervision pursuant to subdivision (a)." (§ 3000.08, subd. (*l*).) Because—as we discuss—defendant was subject to parole supervision under either subdivision (a)(1) or (2) of section 3008, we decline to address whether subdivision (*l*) also applied to defendant.

the statute to accomplish a result consistent with the legislative purpose." [Citation.]' " (*People v. Sylvester* (1997) 58 Cal.App.4th 1493, 1496 (*Sylvester*), italics added.)

However, if a statute is ambiguous, " 'we may consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy.' " (*People v. Costella* (2017) 11 Cal.App.5th 1, 6.) We also may " 'examin[e] the context in which the language appears and adopt[ ] the construction which best serves to harmonize the statute internally and with related statutes.' " (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1126.)

3. Section 3000.08, subdivision (a)(1) and (2) apply to a person who has served prison time for a serious and/or violent offense, respectively, even if the person's current offense for which he or she is being released to parole was not for such an offense

We agree with the parties that section 3000.08 is the operative statute in this appeal. A version of this statute was interpreted in 2015 by Division 3 of this court in *Toussain*.[5] Much like defendant in the instant case, in *Toussain* the defendant moved to dismiss a parole revocation petition filed by CDCR after the defendant violated a condition of parole by tampering with his GPS device. (*Toussain*, *supra*, 240 Cal.App.4th at p. 978.) The defendant in *Toussain* was required to wear a GPS device based on a 1989 sex offense conviction of assault with intent to rape under former section 220. (*Toussain*, at p. 978.) In March 2014, *Toussain* was released on parole after being

---

[5] Effective January 1, 2016, former section 3000.08, subdivision (c) was amended to provide a court with the discretion to release a parolee from custody "under any terms and conditions the court deems appropriate." (Stats. 2015, ch. 61 (Sen. Bill No. 517), § 2, eff. Jan. 1, 2016.) The Legislature again amended section 3000.08 effective January 1, 2017, which is the current version of the statute applicable in this case. (Stats. 2016, ch. 86 (Sen. Bill No. 1171), § 236, eff. Jan. 1, 2017.)

convicted in April 2013 for failing to register as a sex offender under former section 290.018, subdivision (b). (*Toussain*, at p. 978.) The parole revocation petition filed by CDCR alleged the defendant's Static-99R risk category was " 'high,' " as his score was a 7, and he therefore qualified as a high-risk sex offender under former section 3000.08, subdivision (a)(4). (*Toussain*, at p. 978.)

In response, the defendant in *Toussain* asserted that the court lacked "jurisdiction" to hear the revocation petition, and that CDCR "could not supervise him because his most recent prison commitment was not for a crime triggering parole supervision under [former] section 3000.08." (*Toussain*, *supra*, 240 Cal.App.4th at p. 978.) The trial court agreed with the defendant, dismissed the revocation petition for "lack of jurisdiction," and ordered the defendant to be placed on PRCS. (*Ibid.*)

The People appealed, contending that defendant was required to be supervised by parole because CDCR had classified him as a high-risk sex offender, and that "all high-risk sex offenders released from prison must be placed on parole rather than PRCS regardless of the offender's most recent commitment offense." (*Toussain*, *supra*, 240 Cal.App.4th at p. 979.) The *Toussain* court agreed with the People, and reversed the order dismissing the revocation petition.

After reviewing the language of former section 3000.08, subdivision (a), the court in *Toussain* adopted the People's interpretation of this subdivision, persuasively reasoning as follows: "By its terms, section 3000.08 requires parole supervision, not PRCS, *whenever* a person who has committed '[a]ny crime for which the person is classified as a high-risk sex offender.' (§ 3000.08, subd. (a)(4).) Toussain contends parole supervision

16

is required only when the offender's *most recent* prison commitment is for a crime for which the person was classified as a high-risk sex offender, but the plain terms of the statutory language include no such limitation. To the contrary, the Legislature specified that even for offenders already released from prison 'prior to' section 3000.08's effective date on July 1, 2013, the person '*is* subject to' CDCR parole supervision if he or she served a prison term for '[a]ny crime for which the person is classified as a high-risk sex offender.' (§ 3000.08, subd. (a)(4).)

"The Legislature's use of the present tense ('is classified as' and 'is subject to') discloses a plain intent that individuals who *are* classified as high-risk sex offenders shall be subject to parole supervision based on a qualifying commitment offense ('Any crime for which the person is classified as a high-risk sex offender'), even in circumstances where they reoffend and are released from prison after a new offense. In other words, the high-risk sex offender designation remains controlling and requires parole supervision whether the person committed a qualifying offense and first gained release from prison "prior to[,] on *or* after July 1, 2013.' (§ 3000.08, subd. (a)[].) Otherwise, a high-risk sex offender on parole could deliberately commit a low-level felony to prompt parole revocation, serve time on the new offense, and gain release on PRCS rather than continue under parole supervision." (*Toussain*, *supra*, 240 Cal.App.4th at p. 980.)

The *Toussain* court further supported its interpretation of former section 3000.08, subdivision (a) based on what it termed the "important" distinction between parole and PRCS, noting that, unlike parolees and probationers, state law did not require PRCS offenders to participate in a containment model sex offender management program.

17

(*Toussain*, *supra*, 240 Cal.App.4th at p. 981.)  The court thus concluded that, adopting the defendant's interpretation of former section 3000.08, subdivision (a), and placing him under PRCS, would "defeat[] the Legislature's intent to require close monitoring of registered sex offenders."  (*Toussain*, at p. 981.)

We find *Toussain* provides meaningful guidance on our issue.  Like the *Toussain* court, we conclude the language in subdivision (a) of section 3000.08 is unambiguous.  As relevant here, this subdivision requires a person to be supervised by parole if that person was "released from state prison *prior to* . . . July 1, 2013, after serving a prison term . . . for *any* of the following crimes," which list includes a "serious felony as described in subdivision (c) of Section 1192.7" (§ 3000.08, subd. (a)(1)); and a "violent felony as described in subdivision (c) of Section 667.5."  (§ 3000.08, subd. (a)(2).)  *If* the Legislature had wanted to limit subdivision (a)(1) and (2) to apply only when an offender is released from a current prison commitment that qualifies as a serious and/or violent felony, respectively, it easily could have included such language in the statute.

In fact, as originally enacted, such limiting language *was* in the statute.  As originally enacted on April 4, 2011, subdivision (a) of former section 3000.08 provided in relevant part:  "Persons released from state prison *on or after* October 1, 2011, after serving a prison term or, whose sentence has been deemed served pursuant to Section 2900.5, for any of the following crimes shall be subject to the jurisdiction of and parole supervision by the Department of Corrections and Rehabilitation[.]"  (Added by Stats. 2011, ch. 15 (Assem. Bill No. 109), § 469, eff. April 4, 2011, operative Oct. 1, 2011; amended by Stats. 2011, ch. 39 (Assem. Bill No. 117), § 37, eff. June 30, 2011, operative

18

Oct. 1, 2011; Stats. 2011-2012, 1st Ex. Sess., ch. 12 (Assem. Bill No. 17), § 17, eff. Sept. 21, 2011, operative Oct. 1, 2011, italics added.)  Subdivision (a) of former section 3000.08 went on to list the same five crimes appearing in the current statute, including, as relevant here, a "serious felony" (former § 3000.08, subd. (a)(1)); a "violent felony" (*id.*, subd. (a)(2)); and a crime where a person is classified as a "High Risk Sex Offender" (*id.*, subd. (a)(4)).

The legislature history of section 3000.08 shows the same "on or after October 1, 2011" language that appeared in the original version of the statute was repeated in two subsequent amendments.  (See Stats 2012, ch. 24 (Assem. Bill No. 1470), § 44, eff. June 27, 2012; and Stats. 2013, ch. 32 (Sen. Bill No. 76), § 8, eff. June 27, 2013.)  However, key to the instant case, the "on or after" language in subdivision (a) changed in an amendment effective July 1, 2013.  (See Stats. 2013, ch. 31 (Sen. Bill No. 75), § 23, eff. June 27, 2013, operative July 1, 2013; Stats. 2013, ch. 32 (Sen. Bill No. 76), § 9, eff. June 27, 2013, operative July 1, 2013.)

The version of subdivision (a) of former section 3000.08 effective July 1, 2013, added the "prior to" language which remains in current subdivision (a) of this statute.[6] Thus, it is clear from the July 2013 amendment that the Legislature intended section 3000.08 to require a person to be supervised by parole if that person served prison time for any of the qualifying crimes in subdivision (a) of section 3000.08, regardless of *when* he or she committed such crimes. Such an interpretation is consistent with the *Toussain* court's interpretation of the language in former section 3000.08, subdivision (a)(4), applicable to high-risk sex offenders, and with that court's recognition that former section 3000.08 did not require a person to be "reevaulated with each pending release for subsequent commitment offenses" when, as in that case, the person has been found to be a high-risk sex offender. (*Toussain*, *supra*, 240 Cal.App.4th at p. 981.)

---

[6] We note section 3079.1 of the Code of Regulations, titled "Postrelease Community Supervision Exclusionary Criteria," lists several types of crimes and/or criteria that make an inmate *ineligible* for PRCS. (See Cal.Code Regs., tit. 15, § 3079.1.) Subsection (a) of this section provides an inmate is ineligible for PRCS if he or she is "serving a *current* term for a serious felony," as described in subdivision (c) of section 1192.7 or 1192.8. (Italics added.) Subsection (b) of this section uses the same language as subsection (a), except it applies to a violent felony as described in subdivision (c) of section 667.5. We note, however, that section 3079.1 of the Code of Regulations was filed as an emergency on June 26, 2012, *before* the July 2013 amendment to former section 3000.08. Because the currentness requirement in subsections (a) and (b) of section 3079.1 of the Code of Regulations conflicts with the "prior to" language in section 17.5, subdivision (a)(5), discussed *post*, and in section 3000.08, subdivision (a), we conclude section 3079.1 of the Code of Regulations is invalid at least with respect to subdivision (a)(1) and (2) of section 3000.08. (See *In re Schuster* (2019) 42 Cal.App.5th 943, 954-955 [invalidating section 3491, subdivision (b)(3) of the Code of Regulations, which barred early parole consideration for inmates convicted of nonviolent offenses who had a prior conviction for a sex offense and who were required to register under section 290, because that regulation conflicted with section 32(a)(1) of article 1 of the California Constitution, which became law when the electorate in 2016 passed Proposition 57, the Public Safety and Rehabilitation Act of 2016].)

We thus reject the interpretation of section 3000.08 proffered by the parties. In so doing, we note in particular the inconsistency of the People's position with respect to this issue. That is, the People in the instant case claim *Toussain* was properly decided and rely on that case, including in their supplemental briefing. But as is clear from the July 2013 amendment, without the addition of the words "prior to" in subdivision (a) of former section 3000.08 interpreted by the *Toussain* court, a person would not be subject to parole if that person was released from prison before October 1, 2011, even if that person had previously served time for a crime that allowed him or her to be classified as a high-risk sex offender, as was the case in *Toussain* when defendant committed the index sex crime in 1989. (*Toussain*, *supra*, 240 Cal.App.4th at p. 978.)

It is axiomatic that as a court of review, we are not bound to follow the meaning of a statute sought by a party. (See *Tun v. Wells Fargo Dealer Services, Inc.* (2016) 5 Cal.App.5th 309, 327 [rejecting the concession of the defendant made during oral argument regarding the meaning of the word "tender" in Civil Code section 2983.4, a statute awarding a party prevailing under the Automobile Sales Finance Act reasonable attorney fees and costs]; see also *R.J. Land & Associates Construction Co. v. Kiewit–Shea* (1999) 69 Cal.App.4th 416, 427, fn. 4 [recognizing the interpretation and applicability of a statute is a question of law and further noting in the "public interest[,] we have discretion to reject [a party's] concession[ ] because our function to correctly interpret a statute is not controlled by [a party's] concession of its meaning"]; *Bell v. Tri–City Hospital Dist.* (1987) 196 Cal.App.3d 438, 449 [noting a reviewing court " 'is not bound to accept concessions of parties as establishing the law applicable to a case' "],

21

disapproved on another ground as stated in *State of California v. Superior Court* (2004) 32 Cal.4th 1234, 1244.)

Our interpretation of subdivision (a) of section 3000.08 is also consistent with the purposes of the realignment legislation. (See *Toussain*, *supra*, 240 Cal.App.4th at pp. 980–981.) The purpose behind such legislation was codified in section 17.5. (Added Stats. 2011, ch. 15 (Assem. Bill No. 109), § 229, eff. April 4, 2011, operative Oct. 1, 2011; amended Stats. 2011, ch. 39 (Assem. Bill No. 117), § 5, eff. June 20, 2011, operative Oct. 1, 2011.) Reaffirming its commitment to reducing recidivism, the Legislature in section 17.5 declared that "[c]riminal justice policies" based on "building and operating more prisons" were "not sustainable" (§ 17.5, subd. (a)(3)); that "California must reinvest its criminal justice resources to support community-based corrections programs and evidence-based practices" to achieve "improved public safety" (*id.*, subd. (a)(4)); and to accomplish such goals, that "low-level felony offenders who do *not* have *prior* convictions for *serious, violent,* or *sex offenses*" should be realigned "to locally run community based programs." (*Id.*, subd. (a)(5), italics added.)

This interpretation of subdivision (a) of section 3000.08 therefore supports the Legislature's realignment policy goals of placing "low-level felony offenders" in community-based programs *if* such offenders have no "prior" convictions for "serious, violent, or sex offenses." (§ 17.5, subd. (a)(5).)

In concurrence, our colleague contends that, up until the instant majority opinion, it has "been uniformly understood" by CDCR, local county probation departments, as well as the California Attorney General's Office that the serious and violent felony

22

exceptions in section 3000.8, subdivision (a)(1) and (2), respectively, "apply to the defendant's *current offense,* i.e., the one for which he or she served the prison term that is just ending."

We note, however, the lack of *any* case law to support this "uniform[] underst[anding]."

We further note that the administrative authority from the CDCR, on which our colleague relies, predates the July 2013 amendment to section 3000.08, when our Legislature added the words "prior to" to subdivision (a) (see Maj. Opn, fn. 6); that our colleague's interpretation would require us to ignore the words "prior to" and their plain meaning in subdivision (a) of section 3000.08, and instead insert the word "current" in modifying only subdivision (a)(1) and (2), but ostensibly not the other subparts of subdivision (a); that omitting the words "prior to" and inserting the word "current" in subdivision (a)(1) and (2) of section 3000.08 would contravene well-established rules of statutory construction, in which " '*each* word and phrase in the statute should be interpreted to "give meaning to *every* word and phrase in the statute" ' " (see *Sylvester*, *supra*, 58 Cal.App.4th at p. 1496, italics added); that interpreting subdivision (a)(1) and (2) per our colleague would appear to be inconsistent with the interpretation of subdivision (a)(4) of this statute applicable to high-risk sex offenders, as discussed in *Toussain*, *supra*, 240 Cal.App.4th at page 980, which, as discussed at length *ante*, concluded a defendant was subject to parole supervision and not PRCS regardless of when he or she committed a crime that would qualify an individual as such an offender; that public policy actually favors the majority's construction of section 3000.08, as our

23

Legislature clearly limited PRCS to low-risk felony offenders (see § 17.5, subd. (a)(5) [noting that "low-level felony offenders who do not have *prior*[, as opposed to current— as suggested in the concurrence—] convictions for serious, violent, or sex offenses" should be realigned "to locally run community-based programs" (italics added)); that defendant committed crimes in 1984 that clearly qualify as both serious and/or violent felonies under subdivision (a)(1) and (2), respectively, of section 3000.08, which included his act of inserting a gun barrel into the anus of one of his victims, as described in detail *ante*; and finally, that *if* our colleague is correct and subdivision (a)(1) and (2) only apply to *current* serious and/or violent felonies for which a defendant is being released, any such change to section 3000.08 should come from the Legislature and not by judicial fiat, particularly when the interpretation sought by the concurrence is based primarily on secondary authorities and on legislative history predating the July 2013 amendment.

For these reasons, we disagree with our colleague's reasoning in affirming the requirement that defendant be supervised by parole and not PRCS.

4. <u>Defendant's convictions for forcible rape, rape in concert, and robbery qualify as serious and/or violent felonies under subdivision (a)(1) and/or (2) of section 3000.08, respectively</u>

Subdivision (a)(1) of section 3000.08 is applicable if a defendant has committed a "serious" felony within the meaning of subdivision (c) of section 1192.7. Included in this list of serious felonies is rape (§ 1192.7, subd. (c)(3)); robbery (*id.*, subd. (c)(19)); and commission of rape or sexual penetration in concert (*id.*, subd. (c)(34)). We conclude that defendant's 1984 convictions for forcible rape, rape in concert, and robbery were

24

serious felonies within the meaning of section 1192.7, subdivision (c); and therefore, that he was subject to parole supervision under 3000.08, subdivision (a)(1).

We further conclude defendant's 1984 convictions were violent felonies within the meaning of section 667.5, subdivision (c). Included in this list of violent felonies is rape (§ 667.5, subd. (c)(3)); robbery (*id.*, subd. (c)(9)); and rape or sexual penetration in concert (*id.*, subd. (c)(18)). As such, we separately conclude defendant was subject to parole supervision under subdivision (a)(2) of section 3000.08.

DISPOSITION

The order denying defendant's motion to dismiss the parole revocation petition is affirmed.

BENKE, Acting P. J.

I CONCUR:


O'ROURKE, J.

25

Dato, J., concurring and dissenting.

The Criminal Justice Realignment Act of 2011—sometimes referred to as Assembly Bill No. 109 Realignment—made significant changes in where California felons are incarcerated and how they are supervised following incarceration. (Stats. 2011, ch. 15, § 1 (Realignment).) The overall objective, for budgetary and other reasons, was to transfer substantial responsibilities from the state to the local level. This case involves the aspect of Realignment that was designed to reallocate most postrelease supervision responsibilities from the state parole system to county probation departments as part of a new process known as Post Release Community Supervision (PRCS).

Penal Code section 3451[1] sets forth the general rule that felons released from prison after October 1, 2011 will be supervised at the local level. Section 3000.08 allows for state parole supervision in exceptional cases. The specific exceptions are delineated in both subdivision (b) of section 3451 and subdivision (a) of section 3000.08, which are substantively mirror images. Among these exceptions—prisoners who will continue to be supervised by the Division of Adult Parole Operations in the California Department of Correction and Rehabilitation (CDCR)—are persons released from state prison after serving a term of incarceration for a serious felony (as described in section 1192.7, subdivision (c)) or a violent felony (as described in section 667.5, subdivision (c)). (§ 3000.08, subds. (a)(1) and (a)(2); § 3451, subds. (b)(1) and (b)(2).) Until now, it has

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

been uniformly understood by CDCR and local county probation departments as well as the California Attorney General's Office that the serious and violent felony exceptions in sections 3000.08 and 3451 apply to the defendant's *current offense*, i.e., the one for which he or she served the prison term that is just ending. These were never intended to be permanent "status" exceptions that require state-level parole supervision if the defendant has *ever* been in prison for a serious or violent felony.

In this case, Arnell Williams suffered 1984 convictions for forcible rape, rape in concert, and robbery, all of which qualify as serious or violent felonies. He was released from prison in 1996. More than 20 years later, he was again released from prison in 2018 after serving his sentence for two drug offenses, neither of which qualifies as a serious or violent felony. (See Health & Saf. Code, §§ 11351.5 and 11352, subd. (a).) Although the parties in this case dispute whether Williams is appropriately subject to state parole supervision for other reasons, neither Williams nor the People contend he should be on parole based on the exceptions created by sections 3000.08, subdivisions (a)(1) or (a)(2) and 3451, subdivisions (b)(1) or (b)(2).

That question was first raised by this court on its own motion in a letter to counsel soliciting supplemental briefing as to "whether or not subdivision (a)(1) and/or (2) of section 3000.08 apply to defendant based on his 1984 convictions for forcible rape and rape in concert." Both parties responded to the court's inquiry, agreeing that subdivisions (a)(1) and (a)(2) of section 3000.08 do not apply. As the Attorney General explained, "Those subdivisions subject a person to parole when the commitment offense—*not a prior conviction*—constitutes a serious or violent felony." (Italics added.) Defendant's

2

counsel agreed: "Penal Code section 3000.08, subdivisions (a)(1) and (a)(2) do not apply to appellant based on his 1984 convictions . . . ." (Capitalization omitted.) Eschewing the considered position of the parties, the uniform views of knowledgeable and respected commentators, and CDCR's consistent application of the statute, the majority opinion concludes that a released prison inmate must be subject to state parole supervision if that inmate *ever* served a prison term attributable to a serious or violent felony. While I acknowledge the majority's right to stake out an independent path—"[t]he final meaning of a statute . . . rests with the courts" (*Dyna-Med*, *Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1389)—I sincerely question the basis for doing so in this case.

A

Realignment was a complex undertaking. Assembly Bill No. 109 was a complicated statute, and it was followed by several pieces of trailer legislation making numerous technical amendments. Despite this complexity, all experts in the field—judges, prosecutors, even CDCR—agree that subdivisions (a)(1) and (a)(2) of sections 3000.08 and subdivisions (b)(1) and (b)(2) 3451 apply to the *commitment* offense and not to prior convictions suffered by the defendant at an earlier point in time.

Emblematic of these commentators are Justice Tricia Bigelow and Judge Richard Couzens (Ret.), recognized experts in California felony sentencing law who provide continuing education classes for judges throughout the state. These jurists collaborated to create an online guide on Realignment. (Bigelow & Couzens, *Felony Sentencing After Realignment* (May 2017) Criminal Justice Realignment Resource Center

3

<https://www.courts.ca.gov/partners/documents/felony_sentencing.pdf> [as of March 24, 2020], archived at <http://perma.cc/E9QZ-DCWH>.)  In describing persons excluded from PRCS supervision under section 3451, subdivision (b), the authors explain that those exclusions consider "the *current* crime of commitment, not the defendant's *prior* crimes."  (Bigelow & Couzens, *supra*, at p. 90.)  "Section 3451[, subdivision] (b) focuses on 'any person released from prison after having served a prison term' for any of the excluded circumstances.  In other words, merely because a defendant has a prior strike would not exclude him from PRCS, so long as the term he was serving was not a third strike offense or was for any of the other excluded offenses."  (*Ibid*.)  Judge Couzens and Justice Bigelow reiterate the same point in a Rutter Guide publication.  (Couzens et al., Cal. Law and Proc. Sex Crimes (The Rutter Group 2019) ¶ 13:17.)

Other commentators from a variety of backgrounds have consistently reached the identical conclusion.  Loyola Law School Professor Laurie L. Levenson observes that "[t]he following inmates do *not* qualify for PRCS release:  (1) state prisoners whose *commitment offense* [is] a serious or violent felony . . . ."  (Levenson, Cal. Criminal Proc. (The Rutter Group 2019) ¶ 31:3, p. 31-5, italics added.)  The Continuing Education of the Bar (C.E.B.) treatise on criminal law and practice similarly explains that "[a] felon who is released from state prison . . . is subject to parole supervision by the CDCR if the *commitment offense* involved [¶] [a] serious felony under [section 1192.7, subdivision] (c); [¶] [or] [a] violent felony under [section 667.5, subdivision](c) . . . ."  (Cal. Crim. Law Proc. & Prac. (Cont.Ed.Bar. 2018) § 47.4C, p. 1512, italics added.)  San Diego County Deputy District Attorney (and now Superior Court Judge) Lisa Rodriguez

4

wrote an article from a practitioner's viewpoint, noting that under Realignment state parole is statutorily "limited to offenders released after serving a term for a serious or violent *committing* offense . . . ." (Rodriguez, *Criminal Justice Realignment: A Prosecutor's Perspective* (Apr. 2013) vol. 25, No. 4 Federal Sentencing Reporter 220, 223 (hereafter Rodriguez).)

Echoing this interpretation is a research report from the Chief Justice Earl Warren Institute on Law and Social Policy at the University of California, Berkeley School of Law. Explaining why only the commitment offense matters for purposes of section 3000.08, subdivisions (a)(1) and (a)(2), author Rebecca Silbert provides helpful context distinguishing local *incarceration* from local *supervision*. Realignment provides for incarceration at the local level if a felon is convicted of a "non-non-non"—that is, a non-serious, non-violent, non-sexual crime—*and* does not "have any serious or violent prior convictions." (Silbert, Thinking Critically About Realignment in California (Feb. 2012) p. 5 <https://www.law.berkeley.edu/files/bccj/Thinking_Critically_3-14-2012.pdf> [as of March 24, 2020], archived at <https://perma.cc/NUA6-3FTH>.) But for felons incarcerated in and released from state prison, "only the current crime of conviction matters" for purposes of deciding the type of postrelease supervision. "So long as the *current conviction* is non-serious, non-violent, and non-sexual, *regardless of prior convictions*, the person will be released on PRCS." (*Ibid.*, italics added.) Indeed, the reality under Realignment is that if a defendant has *never* been convicted of a serious or

violent felony, he or she will typically serve local prison time in county jail (§ 1170, subd. (h)) and will not be sentenced to state prison.[2]

Finally, and perhaps most significantly given that the issue is one of legislative intent, the Legislative Analyst's Office published an update on Realignment soon after its enactment, as part of the 2012-2013 budget process. (Legis. Analyst, The 2012–13 Budget: The 2011 Realignment of Adult Offenders—An Update (Feb. 2012) <https://lao.ca.gov/analysis/2012/crim_justice/2011-realignment-of-adult-offenders-022212.pdf> [as of March 24, 2020], archived at <https://perma.cc/7FX-XZCF>.) As the update summarized, "[f]ollowing realignment, . . . state parole agents only supervise individuals released from prison whose *current offense* is serious or violent . . . ." (*Id.* at p. 7, italics added.)

B

Realignment was proposed as part of the Governor's 2011–2012 budget. Substantively the program was adopted by the Legislature with no major changes.[3] As a

---

[2]    The legislative purpose codified in section 17.5—that of "realigning low-level felony offenders who do not have prior convictions for serious, violent, or sex offenses to locally run community-based corrections programs"—refers to incarceration rather than supervision. (Compare maj. opn. at p. 22, *ante*.) Under section 1170, subdivision (h)(3), individuals convicted of non-serious, non-violent, non-sexual crimes will generally serve their sentences in county jail instead of state prison, *so long as* they do not have any serious or violent felony convictions. As discussed below, no similar limitation is found in section 3000.08, subdivisions (a)(1) or (a)(2).

[3]    Fiscally, the Legislature made changes regarding how the program would be funded. (Legis. Analyst, 2011 Realignment: Addressing Issue to Promote Its Long-Term Success (Aug. 2011) p. 1 <lao.ca.gov/reports/2011/stadm/realignment/

key player in the executive branch—and perhaps *the* key affected agency—CDCR could be expected to understand what was intended by Realignment. This reality gives added weight to the usual rule that we accord deference to the interpretation of a statute by the administrative agency charged with its implementation. (See, e.g., *Ralphs Grocery Co. v. Workers' Comp. Appeals Bd.* (1995) 38 Cal.App.4th 820, 828.)

Had Realignment contemplated state parole supervision for released inmates with prior-but-not-current serious or violent felonies, one might expect CDCR would vigorously protest any infringement on its jurisdiction. What we find, instead, is that CDCR consistently construed sections 3000.08 and 3451 to require local supervision of released inmates if their *current commitment offense* was not a serious or violent felony. Thus, from the time Assembly Bill No. 109 was enacted in April 2011 to the time that Realignment became fully operative in July 2013, as well as thereafter, CDCR continued to take the position that "[c]ounty-level supervision for offenders upon release from prison includes current non-violent, current non-serious (*irrespective of priors*), and some sex offenders." (CDCR, 2011 Public Safety Realignment Fact Sheet (Jul. 15, 2011; Apr. 15, 2013; and Dec. 19, 2013), at p. 3, italics added (CDCR Fact Sheet).) By contrast, those who remain under parole supervision include "[o]ffenders whose *current commitment offense* is violent or serious, as defined by . . . §§ 667.5 [subdivision] (c) and

_____

realignment_081911.aspx> [as of March 24, 2020], archived at <https://perma.cc/RX5C-JBB3>.)

1192.7 [subdivision] (c)." (CDCR Fact Sheet, *supra*, at p. 3, italics added.)[4] Indeed, this court's recent opinion in *People v. Johnson* (2020) 45 Cal.App.5th 379 acknowledged CDCR's consistent position when we quoted from CDCR's Operations Manual, noting that personnel in the Department of Adult Parole Operations " 'shall review the certified court documents to determine if the *commitment* offense meets criteria for PRCS supervision, as described in [sections] 3000.08 and 3451.' " (*Johnson*, at p. 393, fn. 9.)

C

In the face of this uniform and persuasive commentary, the majority focus on a single three-word phrase in a piece of cleanup legislation enacted in July 2011— Assembly Bill No. 116 (Stats. 2011, ch. 136)—that they conclude compels a different interpretative result. In my view, however, the legislative history of Realignment clearly demonstrates this phrase was a minor clarifying addition that was not intended to effect any substantive change, let alone the seismic shift the majority suggest.

As previously noted, Realignment was initially enacted by Assembly Bill No.109 (Stats. 2011, ch. 15). With respect to postrelease supervision of state prison inmates, Assembly Bill No.109 did two major things. First, it enacted the Post Release

_____

4    CDCR no longer stores these documents on its website. The July 2011 fact sheet is currently available on the website for Yolo County (<https://www.yolocounty.org/ home/showdocument?id=22222> [as of March 25, 2020], archived at <https://perma.cc/N5HV-U5F3>); the April 2013 fact sheet is available on the Los Angeles County Sherriff's Department website (<http://shq.lasdnews.net/content/ uoa/CRD/Realignment-Fact-Sheet.pdf> [as of March 25, 2020], archived at <https://perma.cc/56B7-3DKL>); and the December 2013 fact sheet can be found on the Attorney General's office website (<https://oag.ca.gov/sites/all/files/agweb/ pdfs/recidivism/realignment-factsheet.pdf> [as of March 25, 2020], archived at <https://perma.cc/KD2B-4XT9>).

8

Supervision Act of 2011 (§ 3450 et seq.) to create the PRCS concept, providing in most cases for postrelease supervision at the local level by county probation departments rather than at the state level by CDCR.  Second, and consistent with the intent to foster community-based solutions, it transferred responsibility for adjudicating violations of supervision conditions from the Board of Parole Hearings, a state administrative tribunal, to local superior courts.

Assembly Bill No.109 was signed by the Governor and filed with the Secretary of State on April 4, 2011.  As originally conceived, anyone paroled from state prison prior to July 1, 2011 would remain subject to the old system of parole supervision, with violations of supervision conditions administratively adjudicated by the Board of Parole Hearings.  After July 1, persons released from prison would be governed by the new procedures.  Most would be supervised at the local county level by PRCS.  A few would still report to a state parole officer.  And any violations of supervision conditions—whether parole or PRCS—would be adjudicated by local courts.

It quickly became apparent that local courts and local probation departments would not be ready to assume their new responsibilities in a matter of just a few months. In follow up legislation (Assem. Bill No.117) passed at the end of June, the Legislature postponed the start of PRCS until October 1, 2011 and deferred the beginning of superior

9

court jurisdiction for parole revocations until July 1, 2013.[5] (Stats. 2011, ch. 39, §§ 37, 38, 47; see Rodriguez, *supra*, 25 Fed. Sent. Rev. at p. 223.) As a result, this bill created two versions of section 3000.08, one that would operate from October 1, 2011 to July 1, 2013, and the second that would become effective on the latter date. The key difference between the two was that under the second version, courts assumed jurisdiction over parole revocations.

There can be no question that when initially enacted as part of Assembly Bill No. 109 and continuing into Assembly Bill No. 117, sections 3000.08, subdivisions (a)(1) and (a)(2) and 3451, subdivisions (b)(1) and (b)(2) were intended to subject only inmates with *current* serious or violent convictions to state parole supervision. Assembly Bill No. 109 was first introduced in the Senate on January 10, 2011. Among other significant amendments made in March, the Senate added sections 3000.08 and 3451 to the bill. Both provisions recognized corresponding exceptions to PRCS for "[p]ersons released from state prison on or after July 1, 2011, after serving a prison term for . . . [among other things] [a] serious felony . . . [or] [a] violent felony . . . ." (Stats. 2011, ch.15, §§ 469, 479.) The associated Senate Rules Committee report explains that "after July 1, 2011, all offenders released from prison who do not have *current* convictions for serious or violent

---

5     The changes to section 3000.08 were introduced by the Senate Rules Committee on June 28, 2011. The associated committee report explains that section 3000.08 was being "amended to defer for two years the involvement of the court with respect to jurisdiction over these persons for purposes relating to parole revocation and imposition of a term of custody (until July 1, 2013) . . . ." (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Assem. Bill No. 117 (2011–2012 Reg. Sess.) as amended Jun. 28, 2011, p. 6.)

felonies, who are not third strikers, and who are not High Risk Sex Offenders will be subject to post-release supervision by counties rather than subject to state parole supervision." (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Assem. Bill No. 109 (2011-2012 Reg. Sess.) as amended Mar. 14, 2011, p. 3, italics added.) Assembly Bill No. 117 did not change this intent; it just delayed the effective date of sections 3000.08 and 3451 until October 1, 2011. (Stats. 2011, ch.39, §§ 37, 47.)

So what changed thereafter? According to the majority opinion, it was another piece of cleanup legislation— Assembly Bill No. 116—which was signed into law on July 27, 2011, roughly one month after Assembly Bill No. 117. Assembly Bill No. 116 amended the second version of section 3008.08—the one not scheduled to take effect until July 1, 2013— to add three words to the introductory sentence of the statute. Critically by its terms, the bill did not make a similar change either to section 3451 or to the first version of section 3000.08—the one that operated between October 1, 2011 and July 1, 2013. In other words, this change would not take effect until July 2013, nearly two years in the future and 21 months *after* the advent of PRCS.

Previously per Assembly Bill No. 117, section 3000.08, subdivision (a) read, "Persons released from state prison on or after July 1, 2013, after serving a prison term . . . for . . . (1) A serious felony . . . [or] (2) A violent felony . . . " would be subject to "parole supervision by [CDCR] and the jurisdiction of the court in the county where the parolee is released or resides . . . ." (Stats. 2011, ch.39, § 38.) After the enactment of Assembly Bill No. 116, the statute applied to such classes of persons if they were "released from state prison *prior to or* on or after July 1, 2013." (Stats. 2011, ch.136, § 5

11

[amended language in italics].)  According to the majority, broadening the scope of section 3000.08, subdivision (a) to include persons released "prior to" July 1, 2013—the operative date of the second version of the statute—necessarily means the Legislature intended to disqualify from PRCS any inmate who *ever* served a prison term for a serious of violent felony.

There are significant problems with construing this three-word addition in the manner suggested by the majority opinion.  First, the legislative history indicates that the revisions effected by Assembly Bill No. 116 were "technical" corrections to Assembly Bill No. 117, which in turn was described as making "specified technical and conforming revisions" to Assembly Bill No. 109.  (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Assem. Bill No. 116 (2011–2012 Reg. Sess.) as amended Jul. 6, 2011, p. 1.)  Expanding state parole supervision to anyone who had *ever* served a prison term for a serious or violent felony can in no way be characterized as a "technical" correction.  Conversely, if the Legislature intended such a significant change from what it contemplated in enacting both Assembly Bill Nos. 109 and 117 in the same general timeframe, it is reasonable to assume there would be something in the legislative history of Assembly Bill No. 116 to reflect that intent.  There is nothing.  All we have— admittedly after the fact—is the February 2012 Legislative Analyst's update and the continuing CDCR Realignment Fact Sheets, both of which explain that PRCS applies as long as the *current commitment offense* is not a serious or violent felony.

Second, if the purpose of the amendment was to correct a perceived flaw in Assembly Bill No. 109 with respect to who was subject to state parole, why wouldn't the

12

Legislature have made the same amendment to the *first* version of section 3000.08, the one that was effective between October 2011 and July 2013? Again, Assembly Bill Nos. 116 and 117 were enacted a month apart in 2011, before Realignment took effect in October 2011. With respect to prisoners with prior-but-not-current serious or violent felonies, there is no logical reason why the Legislature would require state parole supervision for inmates released before October 1, 2011 (§ 3000.09), switch to PRCS for inmates released between October 2011 and July 2013 (former § 3000.08, Stats. 2011, ch. 39, § 37), then return to parole supervision for those released after July 1, 2013 (§ 3000.08, Stats. 2011, ch. 136, § 5).

Third, with respect to the exception to PRCS supervision, section 3000.08, subdivisions (a)(1) and (a)(2) and section 3451, subdivisions (b)(1) and (b)(2) are substantively mirror images. Section 3451 states the general rule of PRCS supervision, subject to specified exceptions in subdivision (b). Section 3000.08 provides for limited state parole supervision based on the exceptions listed in subdivision (a). The phrasing of the exceptions in the two statutes is identical. If the Legislature intended Assembly Bill No. 116 to substantially expand the state parole exceptions, the "prior to or" language would have been added to both statutes to avoid an irreconcilable inconsistency. Yet Assembly Bill No. left section 3451, subdivision (b) untouched. To this day, it reads: "Notwithstanding any other law and except for persons serving a prison term for any crime described in subdivision (b), all persons released from prison *on and after October 1, 2011* . . . shall, upon release from prison . . . , be subject to community supervision

13

provided by the probation department of the county to which the person is being released . . . ."  (Italics added.)

So there must be another explanation for this difference between 3000.08, subdivision (a) and 3451, subdivision (b).  And closer scrutiny confirms that the statutes have yet another difference, unrelated to parole supervision, that led to the addition of the "prior to or" language in the former but not the latter.

The exceptions to PRCS supervision listed in section 3000.08, subdivision (a) and section 3451, subdivision (b) are carbon copies, but that is not to say that the statutes in their entirety are identical.  The major difference between the two is that section 3000.08 addresses a key feature of Realignment not touched on by section 3451—local court jurisdiction over parole revocation matters.  Recall that one of the principal purposes of Assembly Bill No. 117 was to delay until July 2013 commencement of superior court jurisdiction over parole revocation proceedings.  By amending section 3000.08 as part of Assembly Bill No. 116, the Legislature wanted to make sure that when superior courts began adjudicating parole violations in July 2013, they could consider matters for prisoners initially released between October 2011 and July 2013, after Realignment took effect.  As section 3000.08 is worded, the failure to add "*prior to or*" before "on or after July 1, 2013" would have precluded local courts from hearing these matters.

This rationale explains why the "prior to" language was added only to section 3000.08, and not to section 3451.  Section 3451 delineates carveouts to PRCS eligibility and has no occasion to describe revocation jurisdiction as to persons remaining under *parole* (versus community) supervision.  It further underscores why the added language

14

was not intended to change what had been understood and accepted since the enactment of Assembly Bill No. 109—pursuant to sections 3000.08 and 3451, released prisoners are subject to PRCS unless their *current commitment offense* was a serious or violent felony.

D

The reasoning of the majority opinion, if followed and not altered by legislative action, will have a profound effect on the current system of postrelease supervision. Almost overnight, CDCR will find itself charged with monitoring a significant group of prisoners that it previously understood were the responsibility of local county probation departments administering PRCS. Yet it will and should have no actual effect on the outcome of this case. Even if Williams's serious and violent *prior* felonies did not disqualify him from PRCS, he still was not entitled to relief. As noted in the majority opinion, CDCR accepted responsibility for supervising Williams not because of his 1984 serious or violent felonies, but due to his being classified as a high-risk sex offender. (§§ 3000.08, subd. (a)(4); 3451, subd. (b)(4).) The trial court found that CDCR followed the applicable statutes, regulations, and policies in concluding that Williams fell within that category. It further found that CDCR's determinations were reasonable, validated, and scientifically valid. There is no showing that the court abused its discretion in making those findings.

Accordingly, I agree the superior court did not err in concluding that Williams was properly subject to state parole supervision, and it correctly denied his motion to dismiss the petition for parole revocation.  But while I concur in the result reached by the majority opinion, I cannot join its reasoning.

DATO, J.